2012 COA 176

**The PEOPLE of the State of Colorado,
Plaintiff–Appellee,**

v.

**Jon Richard PHILLIPS, Defendant–
Appellant.**

**No. 08CA2013.**

Colorado Court of Appeals,
Div. IV.

Oct. 25, 2012.

**142**

John W. Suthers, Attorney General, Paul Koehler, First Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Samler & Whitson, P.C., Hollis A. Whitson, Eric A. Samler, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge FURMAN.

## TABLE OF CONTENTS

I.  C.G.'s Death ................................................................. 143
    A.  C.G.'s Bruised Ear .................................................... 143
    B.  The Welfare Check and Visit to the Center ............................. 144
    C.  C.G.'s Other Statements at School .................................... 145
    D.  Easter Dinner ........................................................ 145
    E.  Berry's Voicemail .................................................... 145
    F.  The Day of C.G.'s Death .............................................. 145
    G.  The Autopsy of C.G. .................................................. 147
    H.  The Search of Defendant's Apartment .................................. 147
    I.  D.P.'s Testimony ..................................................... 148
    J.  D.P.'s Therapist ..................................................... 148
    K.  The Detective ........................................................ 148

II.  CCTV Under the Federal and State Constitutions ........................... 149
    A.  CCTV Proceedings ..................................................... 150
    B.  Federal Confrontation Clause ......................................... 150
    C.  State Confrontation Clause ........................................... 152

III.  Hearsay ................................................................. 153
    A.  Overview of the Law Regarding Hearsay ................................ 153
    B.  Overview of the Law Regarding Confrontation Clauses .................. 153
        1.  Federal Constitution's Confrontation Clause ..................... 153
            a.  The United States Supreme Court ............................ 153
            b.  The Colorado Supreme Court ................................. 155
            c.  Summary of Federal Confrontation Clause Analysis ........... 156
        2.  State Constitution's Confrontation Clause ....................... 156
            a.  Post-*Crawford* ............................................ 156
            b.  Summary of State Confrontation Clause Analysis ............. 157
        3.  Confrontation Clause Standard of Review ......................... 157
    C.  Overview of the Law Regarding the Child Hearsay Statute ............. 157
        1.  Statutory Text and Nonexclusive Factors ......................... 157
        2.  The Child Hearsay Statute and the Federal Confrontation Clause .. 158
        3.  The Child Hearsay Statute Standard of Review .................... 159
    D.  Overview of the Law Regarding Constitutional Harmless Error ......... 159

IV.  Defendant's Hearsay Objections .......................................... 160
    A.  Admission of Berry's Voicemail ....................................... 160
        1.  Multiple Levels of Hearsay ...................................... 160
        2.  C.G.'s Statement to D.P. ........................................ 160
        3.  D.P.'s Statement to Berry ....................................... 161
        4.  Berry's Statement to Defendant .................................. 161
    B.  Admission of C.G.'s Statements to Various Adults .................... 161
        1.  C.G.'s Statements to the Public School Employees ................ 161
        2.  C.G.'s Statements to the Police Officer During the Welfare Check  163
        3.  C.G.'s Statements to the Caseworker ............................. 164

    4.  Hearsay Statements Made to Mandatory Reporters of Child Abuse
        Are Not Necessarily Testimonial ........................................165
  C.  Admission of D.P.'s Statements to Various Adults .........................166
    1.  D.P.'s Statements to His Mental Health Therapist ......................166
    2.  D.P.'s Statements to the Detective Analyzed Under the Child
        Hearsay Statute ...........................................................167
  D.  Harmless Error as to C.G.'s and D.P.'s Other Statements ..................167

V.  Denial of *Batson* Challenge .............................................169
  A.  Law Governing *Batson* Challenges .....................................169
  B.  The Two Challenged Jurors ............................................169
  C.  The Trial Court Did Not Clearly Err ...................................171

VI.  Imposition of Consecutive Sentences .....................................172

VII.  Conclusion ...............................................................172

¶ 1 Defendant, Jon Richard Phillips, appeals his convictions for first degree murder, child abuse resulting in death, and tampering with physical evidence. These convictions stemmed from evidence that defendant starved his stepson, C.G., to death in a linen closet in his apartment.

¶ 2 Defendant challenges his convictions, primarily contending his trial was unfair because numerous child hearsay statements were admitted at trial in violation of the federal and state Confrontation Clauses and state rules of evidence. We affirm the convictions, reverse the sentence in part, and remand for correction of the mittimus.

## I.  C.G.'s Death

¶ 3 The jury heard the following evidence.

¶ 4 C.G. and his half-brother, D.P., had the same biological mother, who lost custody of the boys in March 2006 through a Jefferson County dependency and neglect action. The Jefferson County Department of Human Services placed custody of both boys with defendant, who was D.P.'s father but not C.G.'s. At the time, defendant lived with his girlfriend, Sarah Berry. D.P. was five years old and C.G. was six years old.

¶ 5 On January 11, 2007, Jefferson County ended protective supervision over the two children.

## A.  C.G.'s Bruised Ear

¶ 6 On January 17, 2007, in C.G.'s kindergarten class, a teacher's aide saw "red marks on C.G.'s neck" in which "the skin was raised and welts and it looked like fingerprints."

She asked C.G. what happened to his neck, and he said, "My dad squeezed my neck." She asked him if it hurt, and he said, "No, but my ear hurts." She then noticed that C.G.'s right ear was "bruised severely." C.G. told her, "My dad clobbered me."

¶ 7 C.G.'s kindergarten teacher noticed both that his right ear "was very dark, very blue, very black" and that he had a "[r]ed round mark on his neck." When she asked him what had happened, he replied, "My dad held me in the shower and kept hitting my ear."

¶ 8 C.G. was taken to the acting principal, who also noticed that his right ear "was very swollen and very, very bruised" and "completely black and blue, outer ear and inner ear." She asked him what happened to his ear, and he said, "My daddy put me in the cold shower and he slapped me in the ear over and over again." She asked, "Why did he do that?" and C.G. said, "He was mad at me because my brother made us steal some candy." C.G. volunteered that he sometimes had his dinner in the shower.

¶ 9 She also asked C.G. if anyone had attended to his ear, and he said that defendant "had given him some ice and a hat." C.G. told her that nothing like this had happened before and that he was not worried about going home. After sending C.G. back to his class, the acting principal reported this incident to the Denver Department of Human Services (Department) via the social services hotline.

¶ 10 The following day, the teacher's aide brought C.G. into the school nurse's office.

The nurse noticed that "the top three-quarters" of C.G.'s ear "was black and blue and swollen." She testified, "I asked him what happened, and he said that he had been held under the shower and hit in the ear as punishment."

## B. The Welfare Check and Visit to the Center

¶ 11 On January 19, 2007, a representative of the Department went to defendant's apartment but was unable to speak to anyone. The next day, a social services caseworker with the Department called the Denver Police Department, requesting that officers perform a welfare check on C.G. and D.P. At 1:56 p.m., two Denver police officers responded to defendant's apartment. Berry allowed the officers inside. The first officer spoke with C.G. alone. She asked him if he had any "owies." He lifted up his hair on the left side of his forehead to reveal a bump and a bruise on his right ear. The officer observed that the bruise was "very purple." She asked him how he was injured; he said, "I got slapped," and then told her, "I fell in the bathroom because it was slippery." She asked, "Who did it?" C.G. did not answer. She asked him if he had eaten breakfast, to which he replied, "I'm not good, I don't get things."

¶ 12 The officers took the boys to the Department's Family Crisis Center (Center). When the officers arrived with C.G. and D.P., the officers and the caseworker who had called the police took the boys into the Center's receiving area. The caseworker noticed that C.G.'s right ear was bruised and that he had a bump on his forehead and a scratch on his nose. As the first officer took pictures of C.G.'s injuries, the caseworker asked him where he had gotten them. C.G. said that the bruising to his ear had happened because he slipped and fell in the shower but that he did not know where he had gotten the bump and scratch. The officers then left the room and filled out a juvenile case summary. One of the officers testified that she and her counterpart did not hear the caseworker interview C.G. or D.P.

¶ 13 After the officers left, the caseworker began the interview. She occasionally got up and walked around the room with C.G., put on a movie for the boys to watch, and let C.G. and D.P. speak freely to each other. She asked C.G. what was the difference between the truth and a lie; he said that he "wouldn't go to jail" if he told the truth. She asked him what happened to his ear, and he said again that he had "slipped and fallen in the shower." She later asked him this same question, and he gave the same response, but added that it was not his dad's fault. He also said, "[W]hen [we]'re bad, [we] have to take showers, but when [we]'re good [we]'re allowed to take baths." She overheard C.G. say to D.P. that C.G. had not been able to get a watch because he was bad. She then asked, "Well, what is it that you did that was bad?" C.G. replied that he "had stolen candy from his mom and dad." She then watched C.G. turn back to D.P. and say to D.P., "You also weren't listening, and Daddy asked why you were being like me."

¶ 14 The caseworker then took C.G. and D.P. to the Center's cafeteria. She opened the door to one of the refrigerators: "[C.G.'s] eyes lit up ... [and][h]e got very excited, very happy, and he started to point to everything in the refrigerator. He wanted a little bit of everything on his plate." C.G. had three hot dogs, a bag of chips, pudding, and milk.

¶ 15 After consulting with her supervisor, the caseworker filled out a safety plan requiring defendant and Berry to appear at the Center the following Monday. The safety plan required that defendant and Berry not discuss C.G.'s injuries with the boys, and not discipline them.

¶ 16 The caseworker then drove C.G. and D.P. home. During the drive, she heard D.P. say, "Well, sometimes they're bad to us," and D.P. said "they" were defendant and Berry. She asked D.P. to explain his statement. D.P. said that sometimes defendant and Berry made him "eat nasty food." C.G. then interjected and said, "[D.P.], you know they respect us, [Berry] says they respect us, she always tells us that they respect us." D.P. also mentioned that sometimes he and C.G. "ha[d] to take showers instead of baths."

¶ 17 When the caseworker arrived at the apartment, she returned the boys to defendant and Berry and secured defendant's and Berry's signatures on the safety plan.

## C. C.G.'s Other Statements at School

¶ 18 On January 22, 2007, C.G.'s kindergarten teacher overheard C.G. "announcing" to the other children, "My parents are mad at [the teacher]. My parents don't like [the teacher]." She took C.G. aside privately and asked him why he said those things about her. He replied, "Because you keep interrogating me." She said, "We're trying to help you. We want to make sure you're okay." C.G. then said, "Anyway, I just fell down in the shower." She asked him if his parents had told him to say that, and he said, "Yes."

¶ 19 The acting principal was called. C.G. told her that he was not allowed to talk to the teacher and that his dad was upset because the school had called social services. She told C.G. that school was a safe place to be and that it was "not okay" for anyone to hurt him, no matter who they were. C.G. said, "Okay."

¶ 20 That same day, the school nurse met with C.G. He told her that "he had been to the police station." She asked him if the police had looked at his ear, and he said, "Yes." She then noticed a mark on his forehead and a scratch on his face. She asked him if the police had seen those marks too, and he said, "Yes." C.G. then told her that "nobody hit him, that he fell in the bathtub, and that's what he wanted [her] to know," that his parents were mad because the Department had been called, and that "he couldn't tell [her] anything else." She testified that while C.G. had a "happy and bubbly" demeanor on January 18, on January 22, "[h]e was more subdued, and maybe ... serious."

¶ 21 On March 6, 2007, the kindergarten teacher's aide noticed that the skin around C.G.'s eyes was very red and bruised. She asked him where he had been, because the school had been having problems with pink eye. C.G. told her, "I'm supposed to tell you that I have pink eye."

¶ 22 On March 9, 2007, the kindergarten teacher's aide was standing in the hallway outside her classroom at school when C.G. approached her, took her hand, and looked at her. She testified, "He asked me to stop interrogating him because when I do, he gets in so much trouble." She also testified that when C.G. made this statement, he was "begging me" and "pleading with me."

¶ 23 C.G. was withdrawn from school on March 9. He never returned.

## D. Easter Dinner

¶ 24 On April 7, 2007, defendant's mother had an Easter dinner at her house; various family members attended, including defendant, Berry, D.P., and C.G. Defendant's mother observed that C.G. appeared to be in good health with no injuries. According to defendant's older brother, defendant and Berry had grounded C.G. for lying and for blaming Berry for hurting him. Because C.G. was grounded, he could not sit with the other children in attendance, could not watch television, and had to eat oatmeal even though the other attendees ate pork roast, potatoes, vegetables, and dessert.

¶ 25 On April 12, 2007, C.G. turned seven years old.

## E. Berry's Voicemail

¶ 26 On April 28, 2007—eight days before C.G. died—Berry left the following voicemail on defendant's cell phone:

Hey, babe, sorry to bother you at work. I just had a question. [D.P.] just called me over and said that [C.G.] told him that you and I better get him something to drink or he's going to get out of there, come into the kitchen, get a knife[,] and kill us both with the knife. So I just don't really know how to handle it or what to do. So, um, give me a call, please. I love you. Bye.

## F. The Day of C.G.'s Death

¶ 27 On May 6, 2007, around 9:20 a.m., defendant left work early, saying something was wrong with one of his contact lenses. At 10:00 a.m., defendant called his supervisor

and said he would not return to work because his son was having asthma issues.

¶ 28 Just before 3:00 p.m., defendant called 911. Seven seconds after the firefighters, who were a block and a half away at the time, received the call from the 911 dispatch, they arrived at defendant's apartment. They found defendant performing CPR on C.G. and Berry talking on the telephone; according to one firefighter who testified, defendant and Berry "were, considering the conditions, fairly relaxed, it seemed." The firefighters checked C.G. for a pulse in multiple locations but found none. The firefighters began to perform CPR on C.G.

¶ 29 About five minutes later, the paramedics arrived. When they asked what had happened, defendant told them that C.G. had been eating and drinking ten minutes earlier but then had collapsed for no reason in front of the television, that C.G. had been sick with flu-like symptoms for the week prior, that defendant had given C.G. Gatorade, Benadryl, multi-vitamins, and a nebulizer for his symptoms, and that it was not abnormal for C.G. to be this skinny, because he "[ate] like a horse" but did not gain any weight.

¶ 30 Because C.G. was so emaciated, the paramedics had a hard time finding a vein through which to administer any medication. As a result, they had to drill a hole into a bone below one of C.G.'s knees to administer fluids and medication. The paramedics noticed that, throughout this process, defendant and Berry neither showed any emotion nor displayed any interest in where C.G. would be taken. The paramedics continuously performed CPR on C.G. for forty-five minutes, both at the apartment and en route to Swedish Medical Center, where he was pronounced dead.

¶ 31 Various emergency and health care personnel testified about their observations of C.G.'s physical state. A responding firefighter testified that C.G. "was extremely, extremely skinny," that he "appeared very malnourished," and that his skin was "very cool" and "dry." The firefighter also observed that C.G.'s body was "very dirty," that C.G. had multiple bruises on his face and back, and that C.G. had a cut above his left eye which appeared to be healing. A responding paramedic testified that C.G. "was cold to the touch," "had bruising on the left side of his face," had clear, blood-tinged fluid coming out of his left ear, had blue fingernail beds "probably from a lack of oxygen," and "was lying in emesis and vomit." A police officer who had arrived at the apartment while rescue personnel were tending to C.G. testified that C.G. looked like his bones had been wrapped in skin with no underlying muscle. A hospital worker testified that C.G.'s body was dirty and that he "smelled bad."

¶ 32 The director of pediatric emergency medicine at Swedish Medical Center—who pronounced C.G. dead at the hospital—initially observed C.G. in the emergency room. She testified about her observations.

[N]othing prepared me for that moment. Sorry. He was only skin and bones. You could see every bone in his face. You could see every bone in his pelvis. No chronic illness child that I've ever seen in all my years looked anything like this. The first thought that I remember having was that it looked like the pictures that you see from someone in a concentration camp, but it was worse than that.

She added:

- in her fourteen years of practice, she had never seen a child in C.G.'s "horrific" physical condition;

- "[C.G.] had no heartbeat. He was asystolic, ... nonresponsive from the time the paramedics had been on scene. Still didn't respond once he came into the ER";

- the dextrose solution that the paramedics administered to C.G. through his knee had no effect on him "[b]ecause he was already dead when they gave the [d]extrose";

- when C.G. was admitted to the hospital, he had an internal body temperature of 84 degrees, which along with some other physical conditions meant, in her view, that he had been dead for "[m]inimally, an hour";

- "[C.G.] was dead from the time the paramedics saw him";

- C.G.'s abdomen was "concave like a bowl";
- C.G. "had not one bit of muscle tissue on his body anywhere";
- C.G. could not have walked or stood on the day he died, because "[h]is legs [were] atrophied with no muscle and held at a funny angle, contracted in";
- C.G. had multiple cuts and bedsores;
- C.G.'s back displayed lividity, a post-mortem gravitational flow of blood usually occurring "an hour after death";
- defendant told her C.G. had had a flu-like illness for the past week and a half, but that C.G. had been drinking Gatorade and eating oatmeal throughout that time;
- C.G.'s skin was "tenting," meaning he had "[s]evere dehydration," which was inconsistent with an assertion that C.G. had been drinking Gatorade during the prior week and a half;
- in her medical opinion, it would not have been possible for C.G. to be watching television and drinking Gatorade ten minutes before the paramedics arrived; and
- C.G.'s physical condition was "not even close" to looking like normal patients suffering from diabetic ketoacidosis (which was the defense theory at trial).

## G. The Autopsy of C.G.

¶ 33 The coroner, who performed an autopsy on C.G. the morning after his death, testified that:

- C.G. weighed 34 pounds when he died;
- in his medical opinion, "[t] he cause of [C.G.'s] death [was] dehydration and starvation due to restricted fluid and caloric intake";
- C.G.'s physical description at the autopsy was "[a] cachectic, young male child, . . . dry, flaky skin, multiple focal, small abrasions and some contusions or bruises, thin hair, which pulled out easily, sunken eyes, sunken cheeks";
- "[b]asically, [C.G.] looks like a skeleton";
- C.G.'s "extremities particularly, they have somewhat of a broomstick appearance";

- C.G.'s skin was "tenting," and his internal organs were "very dry compared to a normal autopsy";
- in his bladder, C.G. had a quarter of a teaspoon of urine;
- in his stomach, C.G. had half a cup of "mucoid, brown liquid" that "was probably just gastric and intestinal secretions";
- C.G. had elevated levels of sodium, chloride, and urea nitrogen in the vitreous humor of his eyes, which were "[c]onsistent with dehydration"; and
- in his opinion, C.G. did not die from diabetic ketoacidosis.

## H. The Search of Defendant's Apartment

¶ 34 Police officers executed a search warrant on defendant's apartment the day after C.G. died. A police detective testified that:

- on entering the apartment, he "immediately" smelled odors of urine, human feces, and cleaning products;
- the refrigerator had been rigged so the main door would not open unless the upper freezer door was pulled;
- the smell of human feces became "stronger" and "more intense" as he moved further into the apartment;
- the smell was strongest at the closet, "was almost overwhelming" in one spot, and "was coming from the floor";
- he found a receipt, dated two days prior to C.G.'s death, that listed as being purchased "a True Air unit, Filter Breeze, . . . and [an] air purifier";
- there were multiple air purifiers, "several" canisters of air freshener, a canister of disinfectant, and chemical odor-reducers in the apartment;
- "[i]t looked like somebody had cleaned the wall" of the closet and that whoever did it had left streaks;
- there was a fan in the bathroom window, turned on high and pointed such that it was "blowing air out of the apartment";
- the closet door had been modified such that it could not be opened either from the inside or by a child from the outside;

- the modifications to the closet door had been removed prior to the police officers' arrival;

- a hidden security camera was monitoring the kitchen;

- the floor space in the closet was 29 inches by 35 inches, with 18 inches of head room—the amount of space a person would have had if confined to the closet; and

- a piece of carpet the investigative team had recovered from a garbage truck "fit like a glove" inside the closet.

¶ 35 Various crime scene investigators testified that:

- there were upward-oriented fingerprints on the inside of the closet door, as if someone had been touching the door from the inside with their hand facing upward;

- a feces-covered cardboard box, a feces-covered green and white-striped inflatable mattress, a feces-covered piece of carpet that matched the closet, and a purple towel were found at a local dump;

- the baseboards at the bottom of the closet and the closet doors were stained with fecal matter; and

- the mattress, the piece of carpet, and the lowest shelf in the closet tested positive for C.G.'s feces.

### I.  D.P.'s Testimony

¶ 36 D.P. testified via closed circuit television (CCTV) to the jury that:

- when C.G. was in time out, D.P. heard him say, "I'm hungry," and "I want to get out" of time out;

- C.G. would ask D.P. to "get food" when C.G. was in time out;

- C.G. went potty in the closet and it would go "on the box and on the mat";

- defendant had placed the box and "sheet" that were in the closet into the trash can (all of which were stained with C.G.'s urine and feces) (Police later recovered these items after D.P. showed a detective "a box and a sheet" that came from "[t]he closet that [C.G.] was in.").

### J.  D.P.'s Therapist

¶ 37 D.P.'s therapist testified that she began therapy sessions with D.P. on May 10, 2007. During these therapy sessions, D.P. made the following statements to her:

- when C.G. stole food, defendant and Berry made him go into the closet, and the door would be closed on him;

- when C.G. was in the closet, he would not be allowed out to use the bathroom, and so he had to "poop" and "pee" on himself;

- while in the closet, C.G. once "drank some bleach water" because Berry would not allow him to have any water;

- C.G. stole food because he was hungry;

- C.G. often asked defendant and Berry for food because he was hungry;

- C.G. often asked to get out of the closet, and sometimes defendant and Berry would let him out of the closet, but sometimes they would not;

- while in the closet, C.G. would ask defendant and Berry for food and water, and sometimes they would get C.G. food and water, but sometimes "they would forget," and C.G. also would ask D.P. to help him get food and water;

- "[D.P. said] [t]hat his dad didn't want people to know about the closet"; and

- on the day C.G. died, C.G. "wasn't able to talk because his throat hurt," and defendant took the box and "sheet" that had been in the closet where C.G. was confined to a nearby dumpster, called an ambulance, and sat on the couch and watched television until the ambulance arrived.

### K.  The Detective

¶ 38 A police detective testified that, on the day C.G. died and the next day (May 6 and 7, 2007), he interviewed D.P. and videotaped the interviews. The videotapes of both interviews, each of which lasted about fifty minutes, were published to the jury, and transcripts of the interviews were admitted into evidence.

¶ 39 During the May 6 interview, D.P. made the following statements to the detective:

- when he and C.G. were bad, they had to take "mean" cold-water showers;
- C.G. got in trouble for stealing food multiple times; and
- on the day C.G. died, Berry and defendant had to change C.G.'s clothes in the living room "really super duper fast because he was sick," and "when the ambulance came [C.G.] was still shaking."

¶ 40 During the May 7 interview, D.P. made the following statements to the detective:

- when C.G. was put in the closet "when [he'd] kind of been bad" [sic], the door was closed on him, "[h]e needed to sleep in the closet," and "[h]e needed to eat in the closet";
- when C.G. was in the closet, "sometimes he poops in his hands and rubs it all over the walls in the closet," and D.P. knew this because Berry and defendant had told him;
- before paramedics came to the apartment to take C.G. to the hospital, Berry and defendant removed C.G. from the closet and changed his clothes;
- C.G. had to go in the closet "a lot of times";
- when C.G. was in the closet, he would ask D.P. to go get him food while Berry and defendant were asleep, but D.P. said he would not do it "because [he did not] want to get in trouble";
- in the closet, "there was a big box that [C.G.] sits on";
- once, while Berry was giving C.G. a shower, C.G. slipped, fell, and hurt his head; "[C.G.'s] head turns red and uh, it will take a long time until his head turns white again"; C.G. "cried until the shower was over"; and when the shower was over C.G. went "in the closet"; and
- on the day C.G. died, defendant took C.G. out of the closet, removed the box and "a ripped curtain" from the closet, and then, in a dumpster outside of the apartment, threw the box and the curtain away;
- the box and the curtain were thrown away because "[they] had [C.G.'s] poop and pee all over [them]"; and

- neither the box nor the curtain had D.P.'s own "poop and pee" on them.

¶ 41 As noted, at trial, defendant's theory of defense was that C.G. had died as a result of previously undiagnosed diabetic ketoacidosis.

¶ 42 The jury convicted defendant as charged. The trial court then sentenced him to life in prison on his conviction for first degree murder, forty-eight years on his conviction for child abuse resulting in death, to be served consecutively after the life sentence, and one year on his conviction for tampering with physical evidence, to be served consecutively after the forty-eight-year sentence. (Berry subsequently pleaded guilty to second degree murder.)

¶ 43 Defendant appeals, contending:

(1) the trial court violated his federal and state Confrontation Clause rights, by permitting D.P. to testify via CCTV;

(2) the trial court violated his federal and state Confrontation Clause rights, and state hearsay rules, by admitting various out-of-court statements that C.G., D.P., and Berry made;

(3) the trial court erred in denying his *Batson* challenge to the prosecutor's allegedly discriminatory use of peremptory challenges; and

(4) the trial court erred in imposing consecutive sentences for first degree murder and child abuse resulting in death.

¶ 44 We address each contention in turn.

## II. CCTV Under the Federal and State Constitutions

¶ 45 Defendant first contends that the trial court violated his federal Confrontation Clause rights by allowing D.P. to testify via CCTV. We disagree. Defendant also contends this procedure violated his state Confrontation Clause rights—that is, the provision of article II, section 16 of the Colorado Constitution that secures for him "the right . . . to meet the witnesses against him face to face." We disagree with this contention as well, but only because our supreme court has rejected the proposition that article II, section 16 confers either a literal "face to face"

confrontation right or a broader right than the federal Confrontation Clause.

### A. CCTV Proceedings

¶ 46 Before trial, the prosecution moved to have D.P. testify via CCTV under section 16–10–402, C.R.S.2012. Defendant opposed the motion, citing both *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and article II, section 16 of the Colorado Constitution.

¶ 47 At a hearing on the motion, D.P.'s therapist testified that D.P. would be traumatized psychologically if he were made to testify in front of defendant. Based on this testimony, the trial court granted the motion, finding that having D.P. testify in defendant's presence would cause D.P. to suffer "serious emotional distress, if not trauma."

¶ 48 At trial, D.P. testified via CCTV from the court's chambers; one of the prosecutors, one of defendant's attorneys, and one of D.P.'s family members were also present in chambers. Both the court and the prosecution helped the jury see and hear D.P. by placing two books under D.P. to elevate him on the chair in front of the camera, reminding him to sit up "nice and tall" so the jury could see him, having him repeat his answers when he was soft-spoken, reminding him to speak up, and adjusting the microphone to record his answers better. Further, the court allowed defense counsel to cross-examine D.P. fully, and, as required by section 16–10–402(2)(c), C.R.S.2012, defendant had two-way communication with counsel during direct and cross-examination. Finally, without mentioning that the CCTV was shielding D.P. from trauma that would result from being in defendant's presence, the court instructed the jury that D.P. was testifying via CCTV primarily because simply being in a courtroom would be "intimidating" for a five-year-old child, that the jury should not be "swayed by sympathy or prejudice" because of the procedure, and that D.P.'s testimony should be evaluated "the same … as [that of] any other witness."

### B. Federal Confrontation Clause

¶ 49 The United States Supreme Court has held that a state's statutory procedure allowing a child witness to testify via CCTV, out of the defendant's presence, does not violate the federal Confrontation Clause. *Maryland v. Craig,* 497 U.S. 836, 855–57, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). The Court approved the use of CCTV, so long as the trial court finds that (1) the procedure is necessary to protect the child witness's welfare, (2) the child witness would be traumatized specifically by the defendant's presence, and (3) the child witness would suffer more than de minimis distress in the defendant's presence. *Id.* at 855–56, 110 S.Ct. 3157. The Court reasoned that the Clause reflects a preference for, but not an absolute right to, face-to-face confrontation. *Id.* at 844, 849, 110 S.Ct. 3157.

¶ 50 Colorado has a statutory procedure consistent with the one upheld in *Craig,* allowing child witnesses younger than twelve years old at the time of trial to testify by CCTV if:

> (I) The testimony is taken during the proceeding;

> (II) The judge determines that testimony by the witness in the courtroom and in the presence of the defendant would result in the witness suffering serious emotional distress or trauma such that the witness would not be able to reasonably communicate; and

> (III) Closed-circuit television equipment is available for such use.

§ 16–10–402(1)(a)(I)–(III), C.R.S.2012. This statute represents the legislature's judgment as to the circumstances that best accommodate both the public's interest in protecting child witnesses and a defendant's right to confront adverse witnesses. *See People v. Rodriguez,* 209 P.3d 1151, 1156–57 (Colo.App. 2008), *aff'd by an equally divided court,* 238 P.3d 1283 (Colo.2010)(per curiam).

¶ 51 Because the trial court made the requisite findings under *Craig,* 497 U.S. at 855–56, 110 S.Ct. 3157, and carried out the statutory procedure in accordance with section 16–10–402, we conclude the court did not violate defendant's federal Confrontation Clause rights by allowing D.P. to testify via CCTV. *See Rodriguez,* 209 P.3d at 1156.

¶ 52 Defendant nevertheless contends *Crawford* implicitly overruled *Craig*. In support, he quotes Justice Scalia's dissent in *Craig*, which reasoned, in relevant part:

> Seldom has this Court failed so conspicuously to sustain a categorical guarantee of the Constitution against the tide of prevailing current opinion. The Sixth Amendment provides, with unmistakable clarity, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." The purpose of enshrining this protection in the Constitution was to assure that none of the many policy interests from time to time pursued by statutory law could overcome a defendant's right to face his or her accusers in court. . . .
>
> . . . .
>
> [T]he Confrontation Clause does not guarantee reliable evidence; it guarantees specific trial procedures that were thought to assure reliable evidence, undeniably among which was "face-to-face" confrontation. Whatever else it may mean in addition, the defendant's constitutional right "to be confronted with the witnesses against him" means, always and everywhere, at least what it explicitly says: the " 'right to meet face to face all those who appear and give evidence at trial.' "

*Craig*, 497 U.S. at 860–62, 110 S.Ct. 3157 (Scalia, J., dissenting) (quoting *Coy v. Iowa*, 487 U.S. 1012, 1016, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988)); *see id.* at 867, 108 S.Ct. 2798.

¶ 53 Defendant contends that Justice Scalia's dissent in *Craig* foreshadowed his majority decision in *Crawford*, and that the rationale relied on in *Craig* "is no longer sustainable after *Crawford*." Because much of *Craig* was based on the reliability test in *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), *see Craig*, 497 U.S. at 848, 110 S.Ct. 3157, and *Crawford* overruled *Roberts*, *see Crawford*, 541 U.S. at 64–65, 124 S.Ct. 1354, defendant's position may be a valid one. But, the United States Supreme Court has not held that *Crawford* overruled *Craig*. Until the Court explicitly overrules its own precedent, we are not at liberty to infer otherwise. *See Agostini v. Felton*, 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) ("We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent. We reaffirm that '[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.' " (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989))).

¶ 54 Moreover, the weight of cases has rejected the notion that *Crawford* and *Craig* are incompatible. *See Horn v. Quarterman*, 508 F.3d 306, 318–19 (5th Cir.2007); *United States v. Rosenau*, 870 F.Supp.2d 1109, ―― (W.D.Wash. No. CR06–157MJP, Apr. 24, 2012); *State v. Stock*, 361 Mont. 1, 256 P.3d 899, 904 (2011); *Blanton v. State*, 978 So.2d 149, 157–58 (Fla.2008)(Bell, J., specially concurring); *State v. Arroyo*, 284 Conn. 597, 935 A.2d 975, 992 (2007); *State v. Henriod*, 131 P.3d 232, 237–38 (Utah 2006); *State v. Jackson*, 717 S.E.2d 35, 39 (N.C.Ct.App.2011); *Roadcap v. Commonwealth*, 50 Va.App. 732, 653 S.E.2d 620, 625 (2007); *State v. Blanchette*, 35 Kan.App.2d 686, 134 P.3d 19, 29–30 (2006); *State v. Griffin*, 202 S.W.3d 670, 680–81 (Mo.Ct.App.2006); *State v. Vogelsberg*, 297 Wis.2d 519, 724 N.W.2d 649, 654 (App. 2006); *but cf. Coronado v. State*, 351 S.W.3d 315, 321 & n. 30 (Tex.Crim.App.2011).[1]

1. Commentators are divided, however, on whether, and to what extent, *Craig* is still viable under the rationale of *Crawford*. *Compare* David M. Wagner, *The End of the "Virtually Constitutional"? The Confrontation Right and Crawford v. Washington as a Prelude to Reversal of Maryland v. Craig*, 19 Regent U.L.Rev. 469, 471 (2007)(*"Crawford v. Washington* contains dicta incompatible with *Maryland v. Craig* and portends that aberrant decision's downfall." (footnote omitted)), *with* Marc McAllister, *Evading Confrontation: From One Amorphous Standard to Another*, 35 Seattle U.L.Rev. 473, 473 n.3 (2012)(*"Craig* governs the manner in which in-court testimony may be taken, whereas *Crawford* and its progeny determine what out-of-court

## C. State Confrontation Clause

■ ¶ 55 Defendant likewise contends the trial court violated his state Confrontation Clause rights by allowing D.P. to testify via CCTV because article II, section 16 of the Colorado Constitution gives him "the right . . . to meet the witnesses against him face to face." Notwithstanding the plain language support for defendant's argument, binding precedent from our supreme court requires us to disagree.

¶ 56 In analyzing article II, section 16, and cases addressing this provision, our supreme court has rejected the argument that state confrontation rights afford greater protections than their federal counterpart:

[The defendant] contends admission of the unavailable victim's reliable statements deprived him of his state constitutional right literally to confront her face to face at trial. In essence, [the defendant] asks us to overrule our congruent precedent, and interpret the state Confrontation Clause to protect a broader range of rights than does the Sixth Amendment to the United States Constitution. We already have rejected this position and decline to revisit it.

*Compan v. People*, 121 P.3d 876, 885 (Colo. 2005); *see id.* at 886 n. 4 (noting that, after *Crawford*, the court "continued [its] effort at congruency between the federal and state Confrontation Clauses"). Even before *Crawford*, the court held that the two clauses secured identical rights. *See Blecha v. People*, 962 P.2d 931, 941 (Colo.1998) (stating that it adopted *Roberts* for its analysis of article II, section 16 "[i]n an effort to maintain consistency between Colorado law and federal law"); *People v. Newbrough*, 803 P.2d 155, 160 n. 10 (Colo.1990) ("We conclude that our analysis of the federal constitutional right applies with equal force to the confrontation right under the Colorado Constitution.").

¶ 57 Defendant nevertheless contends that we should interpret the phrase "face to face" in article II, section 16 as giving him the right to confront the witnesses against him, in court, "eyeball-to-eyeball." *See People v. Fitzpatrick*, 158 Ill.2d 360, 198 Ill.Dec. 844, 633 N.E.2d 685, 687 (1994); *Commonwealth v. Bergstrom*, 402 Mass. 534, 524 N.E.2d 366, 371–72 (1988) ("The plain meaning of assuring a defendant the right 'to meet the witnesses against him face to face' is that the accused shall not be tried without the presence, in a court of law, of both himself and the witnesses testifying against him."); *Commonwealth v. Ludwig*, 527 Pa. 472, 594 A.2d 281, 284 (1991); *cf. State v. Stephenson*, 195 S.W.3d 574, 591 (Tenn.2006); *but see Brady v. State*, 575 N.E.2d 981, 988 (Ind.1991) (holding that use of CCTV, "which would permit the witness to see the accused and the trier of fact and would allow the accused and the trier of fact to see and hear the witness" would satisfy the state's constitutional right "to a face-to-face meeting"). Defendant preserved this issue, and both parties have briefed it thoroughly.

■ ¶ 58 We recognize that other states, including Illinois, from which Colorado derived much of its constitution, *see Ace Flying Service, Inc. v. Colorado Department of Agriculture*, 136 Colo. 19, 33, 314 P.2d 278, 284 (1957)("[i]t is an historical fact, that when the constitution of the State of Colorado was adopted it was patterned largely upon the constitution of the State of Illinois"), have concluded the phrase "face to face" in their state confrontation clauses secures a broader right of confrontation than the federal Confrontation Clause. *See, e.g., Fitzpatrick*, 198 Ill.Dec. 844, 633 N.E.2d at 687; *Bergstrom*, 524 N.E.2d at 371–72; *Ludwig*, 594 A.2d at 284; *cf. Stephenson*, 195 S.W.3d at 591; *see also Commonwealth v. Amirault*, 424 Mass. 618, 677 N.E.2d 652, 662 n. 8 (1997)(the states of Illinois, after *Fitzpatrick*, and Pennsylvania, after *Ludwig*, deleted the "face-to-face" right from their constitutions); *see also* Marc C. McAllister, *The Disguised Witness and Crawford's Uneasy Tension with* Craig:

statements are subject to the confrontation right."), *and* Daphne A. Oberg, Comment, *Working Within and Around Utah's Section 76–5–411 After Crawford v. Washington: Assessing the Admissibility of Out-of-Court Statements of Child Victims of Sexual Abuse*, 2005 Utah L.Rev. 1101,

1123 ("*Craig*, therefore, addresses the procedures required for confrontation. In contrast, *Crawford* speaks to when confrontation is required. Because the two cases are aimed at different aspects of the Confrontation Clause, they do not necessarily conflict.").

*Bringing Uniformity to the Supreme Court's Confrontation Jurisprudence,* 58 Drake L.Rev. 481, 520 n.239 (2010); Sarah M. Dunn, Note, *"Face to Face" with the Right of Confrontation: A Critique of the Supreme Court of Kentucky's Approach to the Confrontation Clause of the Kentucky Constitution,* 96 Ky. L.J. 301, 316–18 & n.83 (2008) (observing Colorado "ha[s] not considered the issue directly").

¶ 59 Because we are bound by the supreme court's decision in *Compan,* however, we must decline defendant's invitation to follow these other states and interpret article II, section 16 in this manner. *See Compan,* 121 P.3d at 885.

### III. Hearsay

¶ 60 Defendant next contends that the trial court violated the federal and state Confrontation Clauses, and state rules of evidence, by admitting various hearsay statements that C.G., D.P., and Berry made. To address defendant's contentions, we will provide an overview of the law regarding (a) hearsay, (b) the federal and state Confrontation Clauses, (c) section 13–25–129, C.R.S.2012 (the Child Hearsay Statute), and (d) constitutional harmless error. We will then address the challenged statements.

### A. Overview of the Law Regarding Hearsay

¶ 61 Hearsay statements are statements other than those "made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." CRE 801(c). Such statements are presumptively unreliable, because the declarant is not present to explain the statement in context and to be cross-examined. *Blecha,* 962 P.2d at 937. Due to this presumptive unreliability, hearsay statements generally are not admissible as evidence at trial. *Id.; see* CRE 802. A hearsay statement may still be admitted, however, if it falls within a hearsay exception. *See People v. Blecha,* 940 P.2d 1070, 1074 (Colo.App. 1996), *aff'd,* 962 P.2d at 931. "The burden of establishing the preliminary facts to establish the hearsay exception is on the proponent of

the evidence." *People v. Garcia,* 826 P.2d 1259, 1264 (Colo.1992).

¶ 62 If an out-of-court statement is not offered for its truth, however, it is admissible as nonhearsay evidence as long as it is relevant. *People v. Welsh,* 176 P.3d 781, 790 (Colo.App.2007).

¶ 63 We review for abuse of discretion the trial court's evidentiary decisions. *See, e.g., People v. Gonzales–Quevedo,* 203 P.3d 609, 612 (Colo.App.2008). We may uphold the trial court's evidentiary decision on any ground supported by the record, even if that ground was not articulated or considered by the trial court. *Id.* (citing *People v. Quintana,* 882 P.2d 1366, 1371 (Colo.1994)).

### B. Overview of the Law Regarding the Confrontation Clauses

¶ 64 In this section, we will look at opinions from the United States Supreme Court and our state supreme court and provide a summary of the current state of the law. We will then identify the standard of review for Confrontation Clause challenges.

#### 1. Federal Constitution's Confrontation Clause

¶ 65 The federal Constitution provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI.

#### a. The United States Supreme Court

¶ 66 In 2004, the United States Supreme Court held that the federal Confrontation Clause allows the admission of testimonial statements of witnesses absent from trial "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford,* 541 U.S. at 59, 124 S.Ct. 1354. The Court acknowledged, however, that the Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id.* at 59 n. 9, 124 S.Ct. 1354; *accord Williams v. Illinois,* —— U.S. ——, ——, 132 S.Ct. 2221, 2228, 183 L.Ed.2d 89 (2012) (Confrontation Clause "has no application to out-of-court

statements that are not offered to prove the truth of the matter asserted").

¶ 67 In 2006, the Court expounded on the meaning of "testimonial":

Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis v. Washington,* 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).

¶ 68 In 2011, the Court explained the inquiry into the primary purpose of the interrogation:

An objective analysis of the circumstances of an encounter and the statements and actions of the parties to it provides the most accurate assessment of the "primary purpose of the interrogation." The circumstances in which an encounter occurs—*e.g.,* at or near the scene of the crime versus at a police station, during an ongoing emergency or afterwards—are clearly matters of objective fact. The statements and actions of the parties must also be objectively evaluated. That is, the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred.

*Michigan v. Bryant,* —— U.S. ——, ——, 131 S.Ct. 1143, 1156, 179 L.Ed.2d 93 (2011) (citation omitted). The Court reasoned that where police questioned a dying declarant while the person who had shot him was still at large, "the circumstances lacked any formality that would have alerted [the declarant] to or focused him on the possible future prosecutorial use of his statements." *Id.* at ——, 131 S.Ct. at 1166.

¶ 69 The Court explained that its primary purpose inquiry "requires a combined inquiry that accounts for both the declarant and the interrogator. In many instances, the primary purpose of the interrogation will be most accurately ascertained by looking to the contents of both the questions and the answers." *Id.* at ——, 131 S.Ct. at 1160–61 (footnote omitted). The Court reasoned that "whether an emergency exists and is ongoing" when a declarant makes statements, impacting whether the statements offered into evidence are testimonial, is a "highly context-dependent inquiry." *Id.* at ——, 131 S.Ct. at 1158. The Court also reasoned, however, that

there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony. In making the primary purpose determination, standard rules of hearsay, designed to identify some statements as reliable, will be relevant. Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause.

*Id.* at ——, 131 S.Ct. at 1155 (emphasis in original).

¶ 70 Thus, the *Bryant* test for determining the "primary purpose" of interrogation, and, in turn, the testimonial nature of a hearsay statement, is summarized as follows. The primary purpose of an interrogation is determined by objectively evaluating two main elements: (1) the circumstances in which the encounter occurred and (2) the statements and actions of both the declarant and interrogator. *See id.* at ——, 131 S.Ct. at 1156. The first element includes an objective evaluation of factors such as where the encounter occurred, whether it was during an ongoing emergency or afterwards, *see id.,* and the formality of the interrogation, *see id.* at ——, 131 S.Ct. at 1160. The second element includes an objective evaluation of factors such as the nature of what was asked and answered, *see id.,* and the purpose that reasonable participants would have had, rather than the subjective or actual purpose of the indi-

viduals involved, *see id.* at ——, 131 S.Ct. at 1156.

### b. The Colorado Supreme Court

¶ 71 In its recent decisions applying the federal Confrontation Clause, our supreme court has taken two different approaches, depending on the nature of the hearsay at issue.

¶ 72 With respect to *testimonial* hearsay, in *People v. Fry*, 92 P.3d 970, 976 (Colo.2004), the court acknowledged and applied the federal Confrontation Clause analysis of *Crawford*, discarding its prior approach to this Clause as a result:

> In light of *Crawford*, we reject the [*Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)] reliability analysis that we adopted in [*People v. Dement*, 661 P.2d 675 (Colo.1983)]. Consequently, to the extent that [*Stevens v. People*, 29 P.3d 305 (Colo.2001)] and [*People v. Farrell*, 34 P.3d 401 (Colo.2001)] and any of our other prior cases employ that analysis, we overrule those cases.

*Fry*, 92 P.3d at 976. And, in *Raile v. People*, 148 P.3d 126, 130–32 (Colo.2006), a case involving testimonial hearsay provided by a police officer, the court acknowledged and applied the testimonial-nontestimonial analysis in *Davis*.

¶ 73 With respect to *nontestimonial* hearsay, however, our supreme court has held that "the constitutionality of nontestimonial statements is controlled by the federal confrontation clause as set forth in *Roberts*," *Compan*, 121 P.3d at 881, noting "the Supreme Court's holding in *Crawford* only extended to testimonial evidence; nontestimonial statements are still controlled by *Roberts*," *id.* at 882. *Compan* involved the nontestimonial hearsay statements provided by the victim's friend. *Id.* at 880–81.

¶ 74 Later cases from the United States Supreme Court and our state supreme court, however, are inconsistent with this holding. *See Bryant*, —— U.S. at ——, 131 S.Ct. at 1153 (*Crawford* "limited the Confrontation Clause's reach to testimonial statements"); *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 312, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009) (*Roberts* rests on the "since-rejected theory that unconfronted testimony was admissible as long as it bore indicia of reliability"); *Whorton v. Bockting*, 549 U.S. 406, 413–14, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007)(*Crawford* "overruled *Roberts*," which "potentially excluded too much testimony because it imposed Confrontation Clause restrictions on nontestimonial hearsay not governed by that Clause"); *Davis*, 547 U.S. at 824, 126 S.Ct. 2266 ("A limitation so clearly reflected in the text of the constitutional provision must fairly be said to mark out not merely its 'core,' but its perimeter."); *Arteaga–Lansaw v. People*, 159 P.3d 107, 109 (Colo.2007)("[T]he testimonial or nontestimonial character of any statement is essential to determine whether it is subject to the limitations of the Confrontation Clause at all."); *Raile*, 148 P.3d at 130 ("It is the testimonial nature of the statement that subjects some hearsay statements to exclusion under the Confrontation Clause, while others are merely subject to the rules of evidence." (citing *Davis*, 547 U.S. at 821, 126 S.Ct. 2266)); *id.* at 130 n. 6 ("We note that *People v. Vigil*[, 127 P.3d 916, 922 (Colo.2006),] was decided before this Court had the benefit of the *Davis* decision and that we are bound to follow later decisions by the United States Supreme Court."). Thus, the *Compan* holding appears to be implicitly abrogated by these subsequent holdings.

¶ 75 Admission of nontestimonial hearsay, then, is determined by state rules of evidence. *See Bryant*, —— U.S. at ——, 131 S.Ct. at 1155; *see also People v. Jones*, 313 P.3d 626, 635 (Colo.App.2011)(*cert. granted* May 21, 2012)("If the statement is not testimonial, it does not implicate the defendant's confrontation rights under the United States Constitution." (citing *Bryant*, —— U.S. at ——, 131 S.Ct. at 1153)). Thus, to the extent the trial court admitted nontestimonial hearsay, the federal Confrontation Clause is not implicated, and we analyze its admission solely under our state rules of evidence. *See Bryant*, —— U.S. at ——, 131 S.Ct. at 1155.

¶ 76 Our supreme court also has developed a two-part test to assess whether questioning by a person not affiliated with law enforcement was the "functional equivalent of police

interrogation" (a question *Crawford* and its progeny have expressly reserved): (1) whether and to what extent government officials were involved in producing the statements; and (2) if government officials were involved, whether their purpose was to develop testimony for trial. *Vigil*, 127 P.3d at 922.

¶ 77 The test set forth in *Vigil* was developed before our supreme court had the benefit of *Bryant*. Hence, to the extent the trial court admitted hearsay through the testimony of persons not affiliated with law enforcement, we will analyze whether the hearsay was testimonial solely under *Bryant*.

### c. Summary of Federal Confrontation Clause Analysis

¶ 78 In sum, where a defendant raises a federal Confrontation Clause challenge, we conduct the following analysis. First, we determine whether the hearsay statement is testimonial by applying the test set forth in *Bryant*. *See* — U.S. at —, 131 S.Ct. at 1156. If the statement is testimonial, the federal Confrontation Clause bars its admission unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 59, 124 S.Ct. 1354. If the hearsay statement is nontestimonial, the federal Confrontation Clause is not implicated, *see Bryant*, — U.S. at —, 131 S.Ct. at 1153, and we need only address whether the statement is admissible under our state evidentiary rules, *see id.* at —, 131 S.Ct. at 1155.

### 2. State Constitution's Confrontation Clause

¶ 79 As noted, the Colorado Constitution provides, in relevant part, that "[i]n criminal prosecutions the accused shall have the right ... to meet the witnesses against him face to face." Colo. Const. art. II, § 16. The purpose of this provision is "to prevent conviction by [e]x parte affidavits, to sift the conscience of the witness, and to test his recollection to see if his story is worthy of belief." *People v. Bastardo*, 191 Colo. 521, 524, 554 P.2d 297, 300 (1976), *abrogated in part on other grounds by Fry*, 92 P.3d at 976.

¶ 80 Our supreme court has stated that the essence of this state constitutional right "is to meet adverse witnesses face-to-face and to have [an] opportunity to cross-examine them." *Dement*, 661 P.2d at 679 (citation omitted)(quoting *Bastardo*, 191 Colo. at 524–25, 554 P.2d at 300). The court in *Dement*, however, drew on *Roberts*, 448 U.S. at 65–66, 100 S.Ct. 2531, to formulate the following two-part test for the admissibility of hearsay under our state constitution's Confrontation Clause: (1) the prosecution must either produce the hearsay declarant or show that the declarant is unavailable for trial; and (2) if the declarant is unavailable, the hearsay statements must bear sufficient indicia of reliability. *Dement*, 661 P.2d at 680–81. The court reasoned that the reliability of "evidence falling within a 'firmly rooted' hearsay exception resting upon 'solid foundations' may be inferred." *Id.* at 681 (quoting *Roberts*, 448 U.S. at 66, 100 S.Ct. 2531).

### a. Post–*Crawford*

¶ 81 Post–*Crawford*, our supreme court modified its analysis under the state constitution's Confrontation Clause, depending on the nature of the hearsay at issue. With respect to *testimonial* hearsay, the court adopted the United States Supreme Court's inquiry under the Sixth Amendment. *Fry*, 92 P.3d at 976; *see Compan*, 121 P.3d at 884–85. With respect to *nontestimonial* hearsay, however, the court retained the test in *Dement*. *Compan*, 121 P.3d at 885 ("*Dement* still instructs whether the admission of nontestimonial statements offends the Colorado Confrontation Clause: to admit nontestimonial evidence when the defendant has not had a prior opportunity of cross-examination, the prosecution must show that the declarant is unavailable and the statement bears sufficient indicia of reliability."); *see also Vigil*, 127 P.3d at 927 ("whether the admission of the child's non-testimonial statements to the doctor offended the Colorado Confrontation Clause" was controlled by the test announced in *Dement* ).

¶ 82 *Compan* has not been overruled by subsequent supreme court cases, nor has our supreme court directly considered whether, in light of our supreme court's congruent

precedent, *see Compan,* 121 P.3d at 885, the recent clarification of *Crawford* should affect our state Confrontation Clause analysis. Thus, unless and until it does so, we follow *Compan* and analyze state Confrontation Clause issues involving nontestimonial hearsay under the test set forth in *Dement. See Compan,* 121 P.3d at 885.

¶ 83 We note, however, that under the facts of this case, our analysis of the admissibility of the challenged statements under state evidentiary rules satisfies the requirements of *Dement. See Compan,* 121 P.3d at 885. It is beyond dispute that C.G. was unavailable due to his death. Thus, the only question remaining for the purposes of our state Confrontation Clause analysis is whether the statement is reliable, a question which is answered through the analysis of admissibility under our state rules of evidence. Accordingly, to the extent the trial court admitted C.G.'s nontestimonial statements, we analyze only whether the statements are admissible under our state rules of evidence.

### b. Summary of State Confrontation Clause Analysis

¶ 84 In sum, when a defendant raises a state Confrontation Clause challenge, we conduct the following analysis. We first determine whether the hearsay statement is testimonial by applying the test set forth in *Bryant. See* —— U.S. at ——, 131 S.Ct. at 1156. If the statement is testimonial, the outcome is the same as under the federal counterpart, and our state Confrontation Clause bars its admission unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. *Fry,* 92 P.3d at 976. If the hearsay statement is nontestimonial, where the defendant has not had a prior opportunity of cross-examination, our state Confrontation Clause still applies and bars the statement's admission unless the following test, set forth in *Dement,* is satisfied: "the declarant is unavailable and the statement bears sufficient indicia of reliability." *See Compan,* 121 P.3d at 885 (citing *Dement,* 661 P.2d at 679–81(citing *Roberts,* 448 U.S. at 65, 100 S.Ct. 2531)).

### 3. Confrontation Clause Standard of Review

¶ 85 We review de novo a defendant's contention that the trial court violated his or her Confrontation Clause rights. *Bernal v. People,* 44 P.3d 184, 198 (Colo.2002); *see Lilly v. Virginia,* 527 U.S. 116, 137, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999).

### C. Overview of the Law Regarding the Child Hearsay Statute

¶ 86 In this section, we will examine the text of, and nonexclusive factors used to guide determinations under the Child Hearsay Statute, discuss the intersection of the Child Hearsay Statute and the federal Confrontation Clause, and address the standard of review for challenges under the Child Hearsay Statute.

### 1. Statutory Text and Nonexclusive Factors

¶ 87 The Child Hearsay Statute allows certain out-of-court statements made by child declarants, which would otherwise be hearsay, to be admitted at trial. It provides in relevant part:

An out-of-court statement made by a child, . . . describing any act of child abuse, as defined in section 18–6–401, C.R.S. [2012], to which the child declarant was subjected or which the child declarant witnessed, not otherwise admissible by a statute or court rule which provides an exception to the objection of hearsay, is admissible in evidence in any criminal, delinquency, or civil proceedings in which a child is a victim of child abuse . . . if: (a) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and (b) The child either:

(I) Testifies at the proceedings; or

(II) Is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement.

§ 13–25–129(1)(a)–(b), C.R.S.2012. If the out-of-court statements are admissible either as relevant nonhearsay or under another evidentiary exception to the hearsay rule, this

**158**

statute does not apply. *See* § 13–25–129(1) (allowing admission of "[a]n out-of-court statement made by a child . . . not otherwise admissible by statute or court rule which provides an exception to the objection of hearsay"); *People v. Bolton,* 859 P.2d 303, 309 (Colo.App.1993)("If the child's hearsay statement is *specifically admissible* under another statute or court rule which provides an exception to the hearsay rule, then [the Child Hearsay Statute] is not applicable." (emphasis in original)); *People v. Doss,* 782 P.2d 1198, 1200 (Colo.App.1989)(holding child victim's statements admissible as nonhearsay; "since the statements were otherwise admissible by court rule, [the Child Hearsay Statute] is not applicable by its own terms").

¶ 88 In addition, the supreme court has provided a nonexclusive list of factors to help courts determine whether a child's out-of-court statement is reliable and, therefore, admissible:

(1) [w]hether the statement was made spontaneously;

(2) whether the statement was made while the child was still upset or in pain from the alleged abuse;

(3) whether the language of the statement was likely to have been used by a child the age of the declarant;

(4) whether the allegation was made in response to a leading question;

(5) whether either the child or the hearsay witness had any bias against the defendant or any motive for lying;

(6) whether any other event occurred between the time of the abuse and the time of the statement which could account for the contents of the statement;

(7) whether more than one person heard the statement; and

(8) the general character of the child.

*People v. Dist. Court,* 776 P.2d 1083, 1089–90 (Colo.1989). "These factors provide guidance and direction but are not an immutable set of standards for the trial court in determining that the rather amorphous standard of 'sufficient indicia of reliability' has been met." *Id.* at 1090. Indeed, even if fewer than all of the factors favoring admission are established, the admissibility of the statements is not

foreclosed. *People v. Rojas,* 181 P.3d 1216, 1219 (Colo.App.2008) (the factors "guide the trial court's analysis, but they are not mandatory" (citing *Dist. Court,* 776 P.2d at 1090)); *see id.* at 1220 ("In any event, the fact that not all the relevant factors support admissibility does not require exclusion of the statements.").

2. The Child Hearsay Statute and the Federal Confrontation Clause

¶ 89 In light of *Crawford,* our supreme court has reasoned that testimonial hearsay of an unavailable witness cannot be admitted under this statute:

[The child victim's testimony] was admitted into evidence pursuant to section 13–25–129, . . . an exception to the hearsay rule for certain out-of-court statements of [child victims], including some who are unavailable for trial only because their emotional or psychological health would be substantially impaired were they forced to testify. To the extent that the statute allows for the admission of out-of-court testimonial statements without the defendant being afforded an opportunity to cross-examine the declarant, it is now clear that the statute violates the confrontation guaranty of the Sixth Amendment.

*People v. Moreno,* 160 P.3d 242, 246 (Colo. 2007) (footnote and citation omitted). A division of this court foreshadowed this outcome prior to *Moreno. See People in Interest of R.A.S.,* 111 P.3d 487, 490 (Colo.App.2004)("[B]ecause the juvenile did not have an opportunity to cross-examine the victim, admission of the [victim's] videotaped statements [under the Child Hearsay Statute] violated the juvenile's rights under the [federal] Confrontation Clause.").

¶ 90 Preliminarily, we state two conclusions about this interplay between the federal Confrontation Clause and the Child Hearsay Statute:

1. Where a child's hearsay statement offered under the Child Hearsay Statute is nontestimonial, the federal Confrontation Clause is not implicated. *See Bryant,* — U.S. at —, 131 S.Ct. at 1153, 1155; *Davis,* 547 U.S. at 824, 126 S.Ct. 2266; *see also People v. Mullins,*

104 P.3d 299, 303 (Colo.App. 2004)("[W]here the statement is not testimonial, the Confrontation Clause is not implicated, and the admissibility of such a statement merely depends on the evidentiary rules regarding hearsay and the hearsay exceptions."); and

2. Even if the statement is testimonial, where the defendant is afforded an opportunity to cross-examine the child at trial, the federal Confrontation Clause also is not implicated. *See Rojas*, 181 P.3d at 1219 ("[W]here the child testifies at trial, *Crawford* ... does not modify the analysis [under the Child Hearsay Statute] or warrant treating the issue as one implicating the defendant's confrontation rights."); *People v. Whitman*, 205 P.3d 371, 381 (Colo.App.2007)("Because the [child witnesses] were available and testified, the Sixth Amendment confrontation issue raised by *Crawford* does not apply here." (discussing the Child Hearsay Statute)); *see also Crawford*, 541 U.S. at 59 n. 9, 124 S.Ct. 1354 ("The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it."); *People v. Argomaniz–Ramirez*, 102 P.3d 1015, 1018 (Colo.2004) ("Because the hearsay declarants will testify at trial and will be subject to cross-examination, admission of their out-of-court statements does not violate the Confrontation Clause.").

3. The Child Hearsay Statute Standard of Review

■ ¶ 91 We review for abuse of discretion the trial court's decision to admit child hearsay under the Child Hearsay Statute. *Whitman*, 205 P.3d at 381. Although the court should make specific findings on which factors establish "sufficient safeguards of reliability," its decision to admit the child declarant's hearsay statements will be upheld, even absent such findings, if the record shows an adequate factual basis to support its decision. *Rojas*, 181 P.3d at 1219.

■ ¶ 92 In addition, a trial court should address, as a component of its discretionary decision under the Child Hearsay Statute, when the issue is raised, whether the child hearsay sought to be admitted is testimonial under the federal Confrontation Clause. *See Moreno*, 160 P.3d at 246.

D. Overview of the Law Regarding Constitutional Harmless Error

■ ¶ 93 Confrontation Clause violations are trial errors subject to constitutional harmless error review. *Fry*, 92 P.3d at 980. "The inquiry in a harmless error analysis is 'whether the guilty verdict actually rendered in this trial was surely unattributable to the error,' and 'not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered.'" *Id.* Relevant factors for our inquiry into constitutional harmlessness include the following:

(1) the importance of the declarant's statement to the prosecution's case; (2) whether the statement was cumulative; (3) the presence or absence of corroborating or contradictory evidence on the material points of the witness's testimony; (4) the extent of the cross-examination otherwise permitted; [and] (5) the overall strength of the prosecution's case.

*Arteaga–Lansaw*, 159 P.3d at 110; *see also Merritt v. People*, 842 P.2d 162, 169 (Colo. 1992). Thus, "[t]rial error is considered harmless if there is no reasonable possibility that it affected the guilty verdict." *Arteaga–Lansaw*, 159 P.3d at 110.

¶ 94 At several pretrial hearings occurring on or between January 14, 2008, and April 2, 2008, the trial court heard testimony from numerous witnesses on many out-of-court statements that C.G. and D.P. made, which the prosecution sought to have admitted at trial. In the last of these hearings, defendant's trial counsel challenged, on both federal and state Confrontation Clause grounds, all of these statements.

¶ 95 The court, in a lengthy and reasoned order, ruled that most of C.G.'s and D.P.'s statements would be admissible at trial, under the Child Hearsay Statute and some other evidentiary theories, but that some of the statements would be inadmissible.

¶ 96 Defendant contends the trial court violated federal and state constitutional provisions, and state hearsay rules, by admitting:

(1) statements that Berry made in a voicemail left on defendant's cell phone, which relayed what C.G. and D.P. said;

(2) statements that C.G. made to the public school employees, to the police officer during the welfare check, and to the caseworker;

(3) statements that D.P. made to a mental health therapist from the Mental Health Center of Denver during therapy sessions after C.G.'s death; and

(4) statements that D.P. made to a child abuse police detective on the night of, and the morning after, C.G.'s death.

¶ 97 We address each set of statements in turn.

## IV. Defendant's Hearsay Objections

### A. Admission of Berry's Voicemail

¶ 98 We conclude that statements Berry made in a voicemail left on defendant's cell phone, which relayed what C.G. and D.P. said, did not violate state hearsay rules.

¶ 99 On appeal, defendant does not argue that these statements violated his right to confront the witnesses against him under the federal or state Confrontation Clauses or that the trial court abused its discretion in admitting these statements under the Child Hearsay Statute. Hence, we address these statements only under our state evidentiary hearsay rules, the application of which we review for abuse of discretion. *See Gonzales–Quevedo*, 203 P.3d at 612.

### 1. Multiple Levels of Hearsay

¶ 100 At trial, during the direct examination of a detective who investigated the crime scene, the prosecution, over objection, introduced the voicemail that Berry had left on defendant's cell phone on April 28, 2007.

■ ¶ 101 The voicemail implicates three layers of potential hearsay: (1) C.G.'s statement to D.P.; (2) D.P.'s statement to Berry; and (3) Berry's statement to defendant. Where a statement contains multiple layers of potential hearsay, the court must analyze each layer separately to determine whether it falls within a recognized hearsay exception or exclusion. *See* CRE 805; *Shell v. Parrish*, 448 F.2d 528, 533 (6th Cir.1971)("Hearsay within hearsay should not be excluded if each separate hearsay component conforms to an exception to the hearsay rule." (citing Fed.R.Evid. 805)). We address each layer in turn.

### 2. C.G.'s Statement to D.P.

■ ¶ 102 The People contend C.G.'s declaration to D.P., that "[defendant] and [Berry] better get him something to drink or he's going to get out of there, come into the kitchen, get a knife and kill [them] both with the knife," was admissible to show that, at the time C.G. made it, C.G. (as the declarant) was extremely thirsty. We agree and conclude C.G.'s declaration was a command, not covered by the hearsay rule.

¶ 103 CRE 801(a) defines "statement" in CRE 801(c) as "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him to be communicative."

■ ¶ 104 We conclude this rule applies "only to *statements of fact* which could be considered true or false," and which derive evidentiary value because of their character. *Cardin v. State*, 540 N.E.2d 51, 54 (Ind.Ct.App.1989)(emphasis in original). Further,

[i]mperative declarations, such as orders or instructions, which by their nature can be neither true nor false, cannot be offered for their truth.... Since there is no need to cross-examine the declarant of an imperative statement other than to determine whether the statement was in fact made, these utterances ordinarily fall outside the purview of the hearsay rule.

*Id.* (citing E. Imwinkelried, *Evidentiary Foundations* pt. 1B, § 1(a) (2d ed. 1989); D. Binder, *Hearsay Handbook* § 2.01–2.04 (2d ed. 1983); *Crawford v. Garnier*, 719 F.2d 1317 (7th Cir.1983); *United States v. Shepherd*, 739 F.2d 510, 514 (10th Cir.1984); *Roberts v. State*, 268 Ind. 348, 375 N.E.2d 215, 219 (1978)).

¶ 105 We conclude C.G.'s declaration was a command, phrased as a conditional sentence, offered as circumstantial evidence that C.G. was extremely thirsty. As such, it was not an "assertion" offered "to prove the truth of the matter asserted" and was therefore not covered by the hearsay rule. *See* CRE 801(c); *see also Cardin*, 540 N.E.2d at 54.

### 3. D.P.'s Statement to Berry

¶ 106 We next conclude that D.P.'s statement, relaying C.G.'s statement to Berry, was admissible for the nonhearsay purpose of showing its effect on Berry as the listener.

¶ 107 Under CRE 801(c), if an out-of-court statement is offered solely to show its effect on the listener, it is not offered to prove the truth of the matter asserted and is not hearsay. *People v. Robinson*, 226 P.3d 1145, 1151 (Colo.App.2009); *see McElroy v. State*, 637 N.W.2d 488, 501 (Iowa 2001)("[A] statement that would ordinarily be deemed hearsay is admissible if it is offered for a non-hearsay purpose that does not depend upon the truth of the facts presented. For example, the statement may be offered simply to demonstrate it was made, to explain subsequent actions by the listener, or to show notice to or knowledge of the listener." (citations omitted)).

¶ 108 We conclude that D.P.'s statement to Berry was admissible for the nonhearsay purpose of showing its effect on Berry as a listener, in that she called defendant to notify him of the message soon after D.P. relayed C.G.'s statement to her and sought his advice. *Robinson*, 226 P.3d at 1151.

### 4. Berry's Statement to Defendant

¶ 109 The People contend that Berry's statement to defendant, in which she relayed D.P.'s (and thus C.G.'s) statement, was admissible as a nonhearsay statement by a co-conspirator under CRE 801(d)(2)(E). We agree.

¶ 110 CRE 801(d)(2) provides in relevant part that a statement is not hearsay if "[t]he statement is offered against a party and is . . . a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." The prosecution bears the burden of satisfying the trial court, by a preponderance of the evidence, that the defendant and the declarant were members of a conspiracy and that the declarant made his or her statement during the course of and in furtherance of the conspiracy. *People v. Montoya*, 753 P.2d 729, 733–34 (Colo.1988). The conspiracy need not have been charged. *See People v. Small*, 631 P.2d 148, 161 (Colo. 1981)("A joint participant is considered as a co-conspirator even where no conspiracy has been charged.").

¶ 111 We conclude that Berry's statement to defendant was admissible under CRE 801(d)(2)(E). The trial court found, by a preponderance of the evidence, that there was sufficient evidence of a conspiracy between defendant and Berry "in terms of keeping [C.G.] secluded and perhaps denying him of [sic] either water or food," that the statement constituted "discussions during the period of time between co-conspirators," which satisfies the requirement that the statement be made during the course of the conspiracy (and, in any event, the conspiracy did not end until C.G. died of starvation and dehydration), and that the statement was made in furtherance of the conspiracy because it was "a request for assistance from [Berry] in terms of how to handle the circumstance of what [C.G. was] threatening to do."

¶ 112 Because the record supports the trial court's findings, we conclude that the court did not abuse its discretion in admitting the voicemail into evidence. *See* CRE 805.

### B. Admission of C.G.'s Statements to Various Adults

¶ 113 We next consider whether the trial court violated the federal and state Confrontation Clauses and state hearsay rules, by admitting statements that C.G. made to the public school employees, to the police officer during the welfare check, and to the caseworker. We conclude that it did not.

### 1. C.G.'s Statements to the Public School Employees

¶ 114 We conclude C.G.'s hearsay statements to the public school employees

were nontestimonial because the primary purpose of the questioning was not to "establish or prove past events potentially relevant to later criminal prosecution," *see Bryant,* —— U.S. at ——, 131 S.Ct. at 1155 (quoting *Davis,* 547 U.S. at 822, 126 S.Ct. 2266), but instead to assess C.G.'s injury and determine whether human services should be notified. Our objective evaluation under *Bryant* supports this conclusion. *See id.* at ——, 131 S.Ct. at 1156.

¶ 115 First, as to the circumstances in which the encounters occurred, the encounters occurred at various places inside C.G.'s school, including his kindergarten classroom, and the acting principal's office. Next, as to the existence of an ongoing emergency, while we note there was not an "ongoing emergency" like that in *Bryant, see id.* at ——, 131 S.Ct. at 1164, there was an analogous situation here. C.G. had an obvious injury and, at the time, the public school employees were attempting to elicit information to determine how to properly treat and protect the child for whom they were responsible. *See id.* at ——, 131 S.Ct. at 1155 (reasoning there may be situations other than ongoing emergencies where statements are nontestimonial). Thus, the primary purpose of the questioning was clearly not to "create a record for trial," *see id.,* but to determine whether human services should be notified.

¶ 116 Moreover, the questioning was informal; the public school employees did not conduct a structured interrogation, although all of them asked C.G. similar questions about his injuries. This informality suggests that the public school employees' primary purpose was simply to assess C.G.'s injury and allegations and then determine whether human services should be notified, and the circumstances lacked any formality that would have alerted C.G. "to or focused him on the possible future prosecutorial use of his statements." *Id.* at ——, 131 S.Ct. at 1166.

¶ 117 Second, as to the statements and actions of both the interrogator and the declarant, *see id.* at ——, 131 S.Ct. at 1162, the nature of what the public school employees asked was such that the elicited statements were necessary to ascertain the extent and cause of C.G.'s injuries and determine if any

further action was required. C.G. was making an outcry about his injuries while hinting he may have been coached to minimize them—and the employees responded out of concern over his outcry, as the content of their statements to C.G. reveals. *See In re Kenneth W.,* 359 Ill.Dec. 60, 966 N.E.2d 381, 395 (Ill.App.Ct.2012)(father's questioning of his daughter, a child victim, was nontestimonial because it was "not for the purpose of gathering evidence against her attacker but out of concern for her welfare"); *State v. Krasky,* 736 N.W.2d 636, 641 (Minn.2007) (primary purpose of hospital nurse getting statements from a child victim "was to assess and protect [the child victim]'s health and welfare").

¶ 118 C.G.'s statements and actions also indicate that the public school employees had as their primary concern his health and welfare. *See Vigil,* 127 P.3d at 925 ("[T]he test in determining whether the child's statement is testimonial depends on whether an objective person in the child's position would believe her statements would lead to punishment of defendant." (quoting *People v. Sharp,* 143 P.3d 1047, 1052 (Colo.App.2005), *vacated,* (Colo. No. 06SC 18, 2006 WL 2864916 (Oct. 10, 2006)))).

¶ 119 Thus, because we conclude that these statements are nontestimonial, the federal Confrontation Clause is not implicated, and we need only address whether the admission of C.G.'s hearsay statement satisfies our state rules of evidence. We further conclude that C.G.'s statement to the teacher's aide about his ear hurting was admissible for its truth under CRE 803(3), as an indication of C.G.'s then existing physical condition. *See, e.g., Pena v. People,* 173 P.3d 1107, 1112 (Colo.2007).

¶ 120 We also conclude that defendant's state Confrontation Clause right was not violated with respect to the admission of this evidence because the admission of C.G.'s statement about the then-existing condition of his ear was reliable evidence because it falls within a firmly rooted hearsay exception, CRE 803(3). *See People v. Gash,* 165 P.3d 779, 784 (Colo.App.2006) (state of mind exception is firmly rooted).

### 2. C.G.'s Statements to the Police Officer During the Welfare Check

¶ 121 We conclude that C.G.'s statement, "I fell in the bathroom because it was slippery," to the police officer during the welfare check was admissible for the relevant, nonhearsay purpose of showing that C.G. had been coached to change his account. *See Welsh,* 176 P.3d at 790. C.G.'s other statements to the police officer during the welfare check were hearsay. *See* CRE 801(c). We further conclude, however, that C.G.'s hearsay statements to the police officer were nontestimonial because the primary purpose of the interrogation was not "to establish or prove past events potentially relevant to later criminal prosecution," *see Bryant,* — U.S. at —, 131 S.Ct. at 1155 (quoting *Davis,* 547 U.S. at 822, 126 S.Ct. 2266), but instead to ascertain the conditions of the home and of the children. Several reasons support our conclusion. *See id.* at —, 131 S.Ct. at 1156.

¶ 122 First, as to the circumstances surrounding the encounter, the interview of C.G. took place in defendant's apartment because the Department had asked the police to perform a child welfare check. Thus, the nature of the encounter was not to further a criminal investigation, but rather to assist the Department in determining whether C.G. was safe. Further, the welfare check at defendant's apartment was manifestly informal. *See id.* at —, 131 S.Ct. at 1166 (relying on "the informality of the situation and the interrogation"). This informality suggests that the police officer's primary purpose was to perform the welfare check, and there was nothing in the circumstances to alert C.G. to or focus him on any future prosecutorial use of his statements. *See id.*

¶ 123 Second, as to the statements and actions of both parties, *see id.* at —, 131 S.Ct. at 1162, the police officer asked C.G. whether he had any "owies" and how he had received them. The officer also asked whether C.G. had eaten breakfast. From these questions, we cannot say that a reasonable participant would have had the primary purpose of establishing or proving past events potentially relevant to later criminal prosecution. *See id.* at —, 131 S.Ct. at 1156.

¶ 124 Examining the declarant's statements, C.G.'s vague answers to the officer's questions were not accusatory in nature and did not implicate defendant in criminal conduct. *Cf. id.* at —, 131 S.Ct. at 1161 ("To give an extreme example, if the police say to a victim, 'Tell us who did this to you so that we can arrest and prosecute them,' the victim's response that 'Rick did it,' appears purely accusatory because by virtue of the phrasing of the question, the victim necessarily has prosecution in mind when she answers."). This is so because, to a reasonable child in this circumstance, it would have appeared that the police officer had as her primary concern the child's health and welfare. *Vigil,* 127 P.3d at 925.

¶ 125 Because we conclude these statements are nontestimonial, the federal Confrontation Clause is not implicated, and we need only address whether the admission of C.G.'s injury-related hearsay statements to the police officer satisfied our state rules of evidence. *See Bryant,* — U.S. at —, 131 S.Ct. at 1155. In our view, these statements were admissible under CRE 803(3) as relating to C.G.'s then existing physical condition. *See, e.g., Pena,* 173 P.3d at 1112.

¶ 126 Concerning C.G.'s wordless pointing to his head when the officer asked him if he had any "owies," our conclusion is the same as with C.G.'s statement to the teacher's aide: the reliability of this statement may be inferred because C.G. was addressing his then existing physical condition, which falls within CRE 803(3), a firmly rooted hearsay exception. *See Gash,* 165 P.3d at 784. Hence, we conclude that defendant's state Confrontation Clause right was not violated with respect to this statement.

¶ 127 Because C.G.'s statement about slipping in the shower was admissible for a relevant, nonhearsay purpose, *see Doss,* 782 P.2d at 1200, and because C.G.'s wordless pointing to his head was otherwise admissible under CRE 803(3), *see Bolton,* 859 P.2d at 309, we uphold the trial court's evidentiary decision on these grounds. *Gonzales–Quevedo,* 203 P.3d at 612.

### 3. C.G.'s Statements to the Caseworker

¶ 128 We make the following conclusions.

- C.G.'s multiple statements to the caseworker that he had slipped and fallen in the shower were admissible for the nonhearsay purpose of showing that C.G. had been coached to change his account. *See Welsh,* 176 P.3d at 790.

- C.G.'s reaction to the food in the Center's refrigerator was admissible as nonassertive conduct for the nonhearsay purpose of showing that C.G. was abnormally hungry. *See People v. Stewart* [397 Mich. 1], 242 N.W.2d 760, 763 (Mich. 1976) ("Acts or conduct not intended as assertive are not hearsay and, therefore, they are admissible. It should be noted that nonassertive acts or conduct are not an exception to the hearsay rule—rather, they are not hearsay in the first place.").

¶ 129 We conclude that the rest of C.G.'s hearsay statements to the caseworker were nontestimonial, because the primary purpose of the interrogation was not to establish or prove past events potentially relevant to later criminal prosecution, *see Bryant,* — U.S. at ——, 131 S.Ct. at 1155, but instead to assess C.G.'s welfare.

¶ 130 First, as to the circumstances in which the encounter occurred, *see id.* at ——, 131 S.Ct. at 1156, the interview took place in the Center, after C.G. was taken there by law enforcement personnel. The police did not, however, direct the caseworker to do the interview; rather, the caseworker did the interview because of a report she received from C.G.'s acting principal, to whom C.G. had made nontestimonial statements about his injuries to his ear and neck. Although the caseworker contacted the police department and requested that officers do a welfare check on C.G. and D.P., one of the officers testified that, after C.G. made an outcry to her, their only involvement was to chauffeur C.G. and D.P. to the Center, take pictures of C.G.'s injuries, and complete a juvenile case summary of that information, as shown by the officer's testimony that she was not privy to the caseworker's interview of the boys.

¶ 131 As to the existence of an ongoing emergency, again, though not the typical "ongoing emergency" situation, this situation is analogous to the one present in *Bryant. See id.* at ——, 131 S.Ct. at 1164. The public school employees had reported C.G.'s injuries and allegations to the Department, and the caseworker performed the interview to determine what had happened to C.G. Thus, the purpose of the interrogation was not to gather information or evidence relevant to a later criminal prosecution, but to gather more information to determine an appropriate future course of action in a civil child protection case.

¶ 132 As to the formality of the interview, the bulk of the questioning took place in a "kid friendly" room. Though this interview was somewhat structured, the caseworker asked questions while allowing C.G. and D.P. to watch a video. She also did not separate C.G. and D.P. but, instead, allowed them speak freely to each other while she filled out paperwork and observed their interaction. Thus, even with this level of formality, this interview was still dissimilar to a structured police interrogation and would not have put C.G. on notice that his responses would later be used in a future criminal prosecution. *See id.* at ——, 131 S.Ct. at 1166.

¶ 133 Second, as to the statements and actions of the participants, the caseworker's questions centered around confirming and exploring C.G.'s initial outcry to the public school employees to determine whether child abuse was occurring; if so, to address it and decide whether the Department had child protection obligations; to ensure the safety of C.G. and D.P. if necessary; and to pass the cases onto other caseworkers at the Department. *See* § 19–3–308(4)(b), C.R.S.2012 (detailing Department's ability to offer social services to children and families).

¶ 134 Nothing in C.G.'s responses indicated he understood this interview as having the primary purpose of providing information potentially relevant to later criminal prosecution. *See Bryant,* — U.S. at ——, 131 S.Ct. at 1165. The nature of C.G.'s responses and actions indicated the understanding that the caseworker had, as her primary concern, his health and welfare. *See, e.g., Kenneth W.,*

359 Ill.Dec. 60, 966 N.E.2d at 395; *Krasky*, 736 N.W.2d at 641.

### 4. Hearsay Statements Made to Mandatory Reporters of Child Abuse Are Not Necessarily Testimonial

¶ 135 Defendant nevertheless contends that, because the public school employees and the caseworker were defined as mandatory reporters of child abuse under section 19–3–304(1)(a), C.R.S.2012, and required to report under section 19–3–307(1), (3)(a), C.R.S.2012, they were acting as agents of law enforcement, and any statements made to them were necessarily testimonial under the federal Confrontation Clause. We disagree.

¶ 136 Section 19–3–304(1)(a) provides, in relevant part:

[A]ny person specified in subsection (2) of this section who has reasonable cause to know or suspect that a child has been subjected to abuse or neglect or who has observed the child being subjected to circumstances or conditions that would reasonably result in abuse or neglect shall immediately upon receiving such information report or cause a report to be made of such fact to the county department or local law enforcement agency.

Persons identified in subsection 2 of the statute include both public or private school officials or employees and social workers. § 19–3–304(2)(*l* ), (m), C.R.S.2012. All three public school personnel to whom C.G. made statements were "public or private school officials" as that term is used in the statute, and the caseworker was a "social worker" as that term is used in the statute.

¶ 137 Section 19–3–307(1) provides:

Reports of known or suspected child abuse or neglect made pursuant to this article shall be made immediately to the county department or the local law enforcement agency and shall be followed promptly by a written report prepared by those persons required to report. The county department shall submit a report of confirmed child abuse or neglect within sixty days of receipt of the report to the state department in a manner prescribed by the state department.

And, according to section 19–3–307(3)(a), "[a] copy of the report of known or suspected child abuse or neglect shall be transmitted immediately by the county department to the district attorney's office and to the local law enforcement agency."

¶ 138 No reported Colorado case has addressed the interplay between this statutorily mandated reporting and the federal Confrontation Clause. Courts in other jurisdictions, however, have held that the mere fact of a declarant making a hearsay statement to a statutorily defined mandatory reporter does not make the statement testimonial. *See, e.g., Seely v. State*, 373 Ark. 141, 282 S.W.3d 778, 788 (2008); *People v. Cage*, 40 Cal.4th 965, 56 Cal.Rptr.3d 789, 155 P.3d 205, 219–20 (2007); *State v. Arroyo*, 284 Conn. 597, 935 A.2d 975, 997–99 & n. 20 (2007); *State v. Spencer*, 339 Mont. 227, 169 P.3d 384, 389 (2007). Rather, these courts reason that mandatory reporters are not transformed into investigative agents of law enforcement upon hearing a declarant's hearsay statement because their reporting requirement, by itself, does not compel them to initiate the inquiry, investigate the statement, or ascertain its veracity for the purpose of possible criminal prosecution. *See Cage*, 56 Cal. Rptr.3d 789, 155 P.3d at 219–20 & n. 20; *Spencer*, 169 P.3d at 389 ("There is no indication, however, that the Legislature intended to deputize this litany of professionals and individuals into law enforcement, and we refuse to attach that significance to the duty to report.").

¶ 139 We are persuaded by these authorities. We therefore hold that statements are not rendered testimonial solely because they are made to persons who are subject to mandatory reporting requirements under sections 19–3–304 and 19–3–307. *See also Vigil*, 127 P.3d at 923–24 ("[t]he fact that the doctor was a member of a child protection team does not, in and of itself, make him a government official absent a more direct and controlling police presence" because "the doctor's job involved identifying and treating sexual abuse").

¶ 140 With respect to the public school employees, we conclude that C.G.'s statements to them were not rendered testi-

monial merely because of their statutory duty to report. They were not law enforcement officials; law enforcement officials had not asked them to question C.G. about his injuries; and, they did not otherwise work with law enforcement officials to obtain C.G.'s injury-related statements for later use in prosecuting defendant. *See Arroyo*, 935 A.2d at 999 ("there is no suggestion in the record that the teacher performed any investigatory function whatsoever"); *cf. People v. Lopez*, 946 P.2d 478, 481 (Colo.App.1997)(observing, in *Miranda* context, that "private persons become agents of the police by virtue of [the police's] suggestion, order, request, or participation for purposes of criminal investigation"); *State v. Hosty*, 944 So.2d 255, 261 (Fla.2006) (concluding, without analysis, that statements a disabled adult victim made to her teacher were nontestimonial).

¶ 141 With respect to the caseworker, we conclude C.G.'s statements to her also were not rendered testimonial merely because of her statutory duty to report. She investigated the child abuse allegations to determine if further civil child protection was warranted; she was not a law enforcement official; the police officers were not privy to her interview of C.G. and D.P.; she did not conduct the interview at the behest of law enforcement officials; and, she did not otherwise work with law enforcement officials to obtain C.G.'s statements for later use in prosecuting defendant. *Cf. State v. S.P.*, 218 Or.App. 131, 178 P.3d 318, 330 (2008)(statement child victim made in interview with Child Abuse Response and Evaluation Services (CARES) employee was testimonial because police officer viewed interview via one-way mirror, consulted with CARES, and met with victim's mother immediately after interview, and CARES employees worked with law enforcement to investigate child abuse), *aff'd*, 346 Or. 592, 215 P.3d 847 (2009); *State v. Snowden*, 385 Md. 64, 867 A.2d 314, 325–29 (2005)(child victim's statements to a social worker were testimonial because the police requested that the social worker conduct the interview, the social worker held a police report as she began the interview, a detective was present during the interview, and the victims were aware the detective was there); *State v. Mack*, 337 Or. 586, 101 P.3d 349, 349–53 (2004) (child's statements to a social worker were testimonial where police officers videotaped the interview with the child, the social worker testified she primarily intended the interview to aid law enforcement officials in their investigation, and the trial court found that the social worker's questions were designed to obtain information to use in prosecuting the defendant).

### C. Admission of D.P.'s Statements to Various Adults

#### 1. D.P.'s Statements to His Mental Health Therapist

¶ 142 We next consider whether the trial court violated federal and state Confrontation Clauses, and state hearsay rules, by admitting statements that D.P. made to a mental health therapist from the Mental Health Center of Denver during therapy sessions after C.G.'s death. We conclude it did not.

¶ 143 With respect to the federal and state Confrontation Clauses, we conclude defendant's rights were not violated by the admission of D.P.'s hearsay statements. D.P. testified via CCTV, meaning defense counsel had the opportunity to cross-examine him on any statements he had made to the therapist. *See Crawford*, 541 U.S. at 59 n. 9, 124 S.Ct. 1354 ("[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements."); *Argomaniz–Ramirez*, 102 P.3d at 1018; *Compan*, 121 P.3d at 884–85.

¶ 144 With respect to the Child Hearsay Statute, we conclude the trial court did not abuse its discretion in admitting these statements. The trial court found with record support that (a) D.P. was still upset by C.G.'s death and needed to "cope with the death of his brother"; (b) D.P.'s demeanor and physical actions, and the context in which his statements were made, bolstered their reliability (which goes to whether D.P.'s statements were likely to have been made by a child his age); (c) D.P. made his statements in response to "open ended questions" (rather than leading questions) and was al-

lowed to speak at his own pace; (d) D.P.'s general character was "consistent in many of his statements"; and (e) independent witnesses corroborated D.P.'s statements, even though corroboration was not necessary because D.P. testified. *See* § 13–25–129(1)(b)(I), C.R.S.2012 (child hearsay statute is satisfied if "[t]he child … [t]estifies at the proceedings"); *Rojas,* 181 P.3d at 1219.

¶ 145 Nevertheless, defendant contends that because D.P.'s statements allegedly did not satisfy the other four *District Court* factors, the trial court abused its discretion in admitting the statements. D.P.'s statements, however, could still be admitted even if fewer than all factors favoring admission were established. *Rojas,* 181 P.3d at 1219–20; *People v. Trujillo,* 923 P.2d 277, 282 (Colo.App. 1996) (noting that the eight factors "should not be used to foreclose admissibility on the basis that a factor has not been satisfied" (citing *Dist. Court,* 776 P.2d at 1090)); *People v. Dill,* 904 P.2d 1367, 1373 (Colo.App.1995)(noting that the trial court, in assessing the admissibility of child hearsay under the Child Hearsay Statute, "expressed concern that the statements had not been made close in time to the actual assault but determined that that concern was outweighed by other considerations").

### 2. D.P.'s Statements to the Detective Analyzed Under the Child Hearsay Statute

¶ 146 We next consider whether the trial court violated state hearsay rules by admitting statements that D.P. made to a police detective on the night of, and the morning after, C.G.'s death. We conclude it did not.

¶ 147 With respect to the Child Hearsay Statute, we conclude the trial court did not abuse its discretion in admitting these statements. The trial court found with record support that (a) D.P.'s youth supported the reliability of his statements because of the likelihood that a child D.P.'s age would be truthful, (b) D.P. made the statements directly after C.G.'s death, which eliminated the possibility of an intervening event, (c) D.P. was less likely to have a motive for lying because of the "serious" circumstance of a

family member's death, and (d) D.P.'s general character supported the reliability of his statements. In addition, D.P. used age-appropriate language and made his statements in response to what were, in our view, open-ended, nonleading questions. *See* § 13–25–129(1)(b)(I), C.R.S.2012 (child hearsay statute is satisfied if "[t] he child … [t]estifies at the proceedings"); *Rojas,* 181 P.3d at 1219.

¶ 148 Nevertheless, defendant contends that D.P.'s answers were not spontaneous, that D.P. gave his answers in response to leading questions, and that, for these two reasons, D.P.'s statements were not reliable. We need not address the merits of this contention, beyond our conclusion that the questions were open-ended and nonleading, because D.P.'s statements could still be admitted even if fewer than all factors favoring admission were established. *See Rojas,* 181 P.3d at 1219–20; *Trujillo,* 923 P.2d at 282; *Dill,* 904 P.2d at 1373.

### D. Harmless Error as to C.G.'s and D.P.'s Other Statements

¶ 149 Defendant contends the trial court erred in admitting C.G.'s and D.P.'s other statements. Assuming, without deciding, that these statements were erroneously admitted, we conclude any error was harmless beyond a reasonable doubt, in that there is no reasonable possibility the admission of these statements affected the guilty verdict. This is so because the other properly admissible evidence was overwhelming that defendant knowingly starved C.G. to death in the closet. *People v. Summitt,* 132 P.3d 320, 327 (Colo.2006) (if properly admitted evidence overwhelmingly shows guilt, the trial court's evidentiary error is harmless); *People v. Cevallos–Acosta,* 140 P.3d 116, 130 (Colo. App.2005) (trial court's error in admitting nontestimonial hearsay was harmless beyond a reasonable doubt, due in part to the "overall strength of the prosecutor's case"); *see also* Crim. P. 52(a) ("Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."). An element-by-element examination of both homicide-related convictions shows this to be the case.

¶ 150 Defendant's conviction for first degree murder required proof of the following:

A person commits the crime of murder in the first degree if ... [t]he person knowingly causes the death of a child who has not yet attained twelve years of age and the person committing the offense is one in a position of trust with respect to the victim.

§ 18-3-102(1)(f), C.R.S.2012.

¶ 151 We conclude the evidence overwhelmingly supported defendant's guilt on the first degree murder conviction. As to defendant knowingly causing C.G.'s death, D.P.'s therapist testified about D.P.'s recollection of defendant denying C.G. food and water, confining C.G. in the closet, and removing physical evidence from the apartment. The detective who searched defendant's apartment also testified to the various signs that a child had been locked in the closet and that someone had tried to erase evidence of C.G.'s death. The crime scene investigators testified about finding various items at the local dump that matched the closet and that tested positive for C.G.'s feces. The testimony from the emergency responders, the emergency room pediatrician, and the coroner on C.G.'s physical state and on the cause of death, as well as photographs of C.G.'s body taken at the hospital and the morgue, provided overwhelming support for this element.

¶ 152 As to C.G. not yet attaining twelve years of age, there was uncontroverted evidence that C.G. was seven years old when he died.

¶ 153 Finally, as to defendant being in a position of trust with respect to C.G., there was properly admissible testimony from a Jefferson County social worker that defendant took permanent custody of C.G. on January 11, 2007.

¶ 154 Defendant's conviction for child abuse resulting in death required proof of the following:

A person commits child abuse if such person causes an injury to a child's life or health, or permits a child to be unreasonably placed in a situation that poses a threat of injury to the child's life or health, or engages in a continued pattern of conduct that results in malnourishment, lack of proper medical care, cruel punishment, mistreatment, or an accumulation of injuries that ultimately results in the death of a child....

. . . .

Where death or injury results, the following shall apply: ... [w]hen a person acts knowingly or recklessly and the child abuse results in death to the child, it is a class 2 felony....

§ 18-6-401(1)(a), (7)(a)(I), C.R.S.2012. We conclude the evidence overwhelmingly supported defendant's child abuse resulting in death conviction. Testimony was presented from D.P.'s therapist on D.P.'s description of defendant's abuse of C.G. In addition, Berry's voicemail to defendant on April 28, 2007, implicated defendant as a participant in C.G.'s abuse.

¶ 155 As to a continued pattern of conduct that resulted in malnourishment, lack of proper medical care, cruel punishment, mistreatment, or an accumulation of injuries that ultimately resulted in C.G.'s death, D.P.'s therapist testified regarding D.P.'s description of defendant denying C.G. food and water and confining C.G. in the closet. Further, the police detective and crime scene investigators who executed a search warrant on defendant's apartment testified about the physical evidence they recovered which indicated C.G. had been confined in the closet: the smell of urine, human feces, and cleaning products in defendant's apartment, the modified closet door, upward-oriented fingerprints on the inside of the closet door, and other items found at the local dump that matched the closet. Finally, the testimony from the emergency responders, the emergency room pediatrician, and the coroner on C.G.'s physical state and on the cause of death, as well as photographs of C.G.'s body taken at the hospital and the morgue, also provided overwhelming support for this element.

¶ 156 As to defendant knowingly or recklessly committing the offense, the same admissible evidence on defendant's state of mind that supported the first degree murder conviction also supports this element.

¶ 157 With respect to our state Confrontation Clause, our conclusion and analysis are the same.

## V. Denial of *Batson* Challenge

¶ 158 We next consider whether the trial court erred in denying defendant's *Batson* challenge to the prosecutor's allegedly discriminatory use of peremptory challenges. We conclude it did not.

### A. Law Governing *Batson* Challenges

¶ 159 *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), established that "the Equal Protection Clause [of the Fourteenth Amendment to the United States Constitution] forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." When, under *Batson*, a defendant alleges that the prosecution discriminated in its use of peremptory challenges, a three-step test applies: (1) the defendant must establish a prima facie case, "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose"; (2) once the prima facie case is established, the burden shifts to the prosecution to explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes; and (3) if the prosecution offers a race-neutral explanation, "the trial court must then decide ... whether the opponent of the strike has proved purposeful racial discrimination." *Johnson v. California*, 545 U.S. 162, 168, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005)(quoting *Batson*, 476 U.S. at 93–94, 106 S.Ct. 1712, and *Purkett v. Elem*, 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)); *accord Valdez v. People*, 966 P.2d 587, 589–90 (Colo.1998).

¶ 160 A defendant carries this burden if the trial court can find, by a preponderance of the evidence, that one or more potential jurors were excluded because of race. *Valdez*, 966 P.2d at 590. The defendant does so by demonstrating, for example, that the prosecution's explanation was a pretext. *Id.* Pretext may be shown by demonstrating that the jurors struck by peremptory challenges were similarly situated to jurors who were not struck, but this theory cannot be argued on appeal unless an adequate record was made in the trial court. *See id.* at 594; *Donelson v. Fritz*, 70 P.3d 539, 542 (Colo.App.2002); *cf. Snyder v. Louisiana*, 552 U.S. 472, 483, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008) (conducting comparative juror analysis in situation where trial court "thoroughly explored" concerns of similarly situated jurors); *but see Miller–El v. Dretke*, 545 U.S. 231, 241 & n. 2, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) (conducting comparative juror analysis sua sponte); *People v. Collins*, 187 P.3d 1178, 1183–84 (Colo.App.2008) (same, relying on *Snyder* and *Miller–El*).

¶ 161 Appellate courts review de novo the first two steps in a *Batson* challenge because they are questions of law. *Valdez*, 966 P.2d at 590–91. The third step in a *Batson* challenge is a question of fact as to which the trial court's ruling receives deference, that is, we review the court's third-step findings for clear error. *Id.* at 590.

### B. The Two Challenged Jurors

¶ 162 Mr. M, an African–American, wrote, in response to a question on his jury questionnaire asking whether he "believe[d] that persons accused of committing a crime are given too many or too few rights," that they were given "too few" because "it [is] hard to be believed when people in high positions are ... against you." Further, Mr. M also disclosed on the jury questionnaire that "[his] cousin was convicted of vehicular homicide in 2003 in Arapahoe County." He made the following remarks during voir dire:

- in describing defendant's plea of not guilty, "[It] means until proven innocent beyond a shadow of a doubt, a reasonable doubt, whatever kind of doubt you want to say until it's basically proven proof that he's an innocent man. That's the way he's entered is not guilty";

- in response to defense counsel's question about whether he would hold to a "hesitation in [his] heart" that the prosecution had proven its case, that he had an uncle who "supposedly did something to a little girl, his stepdaughter, while she was

sleeping," that he was the only family member who spoke with the uncle thereafter, and that the uncle later committed suicide; and

• in agreeing with defense counsel's reading of the jury instruction on the presumption of innocence as "[i]t says presumption of absolute innocence," that "[l]ike [defense counsel] said, he's presumed absolutely innocent."

¶ 163 Mr. D, another African–American, was more than one hour late to court for the second day of jury selection.

¶ 164 The prosecution used peremptory challenges to strike Mr. M and Mr. D. Defense counsel objected, and the following dialogue occurred at the bench:

[DEFENSE COUNSEL]: [W]e make a *Batson* challenge both as to [Mr. D] and [Mr. M]. They were the only two African Americans in the first 34 or 35, however far we got, and they were both excused by the government, African American men, just so the record is clear. There are no African American women and no African American men in that portion of the panel.

THE COURT: The People's response?

[PROSECUTOR]: Your Honor, first of all, I would state that we released [Mr. M] based on his answer he was an advocate of the defense's position to a very strong degree and he was very articulate in that position. [sic]

But I preferred other jurors better because they didn't advocate as strongly in the defense's position as [Mr. M] did.

[Mr. D] showed up today more than one hour late. The jury was already seated. The clerk had to move everybody in order to put [Mr. D] into position. And I am concerned about that. He was told to be here at 8:00. It was pas[t] 9:00 when he got here and, quite honestly, that's why I struck him because we can't take delays like that, Your Honor. [sic] Our risk is that he won't appear.

THE COURT: All right.

[DEFENSE COUNSEL]: Your Honor, as to [Mr. M], the positions he expressed were that he thought he could judge credibility which was what the government was

asking. He believed in the presumption of innocence which is what the Court requires of jurors.

There was no point at which he said, I'm going to hold to a higher burden beyond a reasonable doubt. There is no point at which he said, I'm not going to find someone guilty if they prove it. No matter what, there was no point at which he said, You know, I'm in the defense's camp and I'm believing them already. What he said was he believed in the presumption of innocence, beyond a reasonable doubt, the burden required that's this Court's holding as to every single juror. Those were his answers to my questions.

With regard to [Mr. D], Your Honor, there was no inquiry as to why he was late. There was no inquiry as to what held him up. We don't know if he had child care issues, if he had a car problem, if he went down to the City Council chambers and sat down there for a while when all the jurors had been brought down here already. We don't know any of those things, the presumption that the government is making in making their challenge, and they're racially-based challenges and we object.

THE COURT: At this point I'm not certain that there was not a basis for challenge for cause as to either of those jurors. I do note for the record that [Mr. D] did show up about an hour later.

Under the circumstances, the People under *Batson* need to be able to make a non-based—non-raced base reason for their challenges.[sic] I find that that record has been made at this point. So I'll note the *Batson* objection. It's preserved. But I'm going to deny it at this point.

Any additional motions by the defense?

[PROSECUTOR]: I'm sorry. I would just like the record to reflect the questionnaire of [Mr. M] also had a relative who had been convicted and he stated that he believed that people in the system, defendants, are given too few rights and so I want to make a complete record. I assume that will be part of the record because it's a questionnaire.

THE COURT: I'll let the record stand in that regard.

## C. The Trial Court Did Not Clearly Err

¶ 165 We conclude the trial court did not err in denying defendant's *Batson* objection to the prosecutor's use of peremptory challenges on Mr. M and Mr. D. Concerning the first step, defendant made out a prima facie case because no African–American jurors remained on the panel. *See People v. Portley,* 857 P.2d 459, 464 (Colo.App.1992)(holding that "if no members of a cognizable racial group are left on a jury as a result of the prosecutor's exercise of peremptory challenges," a defendant makes a prima facie case).

¶ 166 Concerning the second step, the prosecutor explained, as to Mr. M, that he was "an advocate of the defense's position to a very strong degree," which was undesirable for her as a prosecutor, that he "had a relative who had been convicted" (of vehicular homicide), and that he believed defendants were given "too few" rights. These were permissible race-neutral explanations. *See People v. Vines,* 51 Cal.4th 830, 124 Cal. Rptr.3d 830, 251 P.3d 943, 961 (2011)(in death penalty case, where juror expressed belief that criminal justice system treated some persons unfairly, "the prosecutor could reasonably have concluded that [the juror in question] would be an unfavorable juror from the prosecution's standpoint"); *People v. Douglas,* 36 Cal.App.4th 1681, 43 Cal.Rptr.2d 129, 133 (1995) ("the use of peremptory challenges to exclude prospective jurors whose relatives and/or family members have had negative experiences with the criminal justice system is not unconstitutional").

¶ 167 As to Mr. D, she explained that he showed up "more than one hour late" and that "we can't take delays like that." These too were permissible race-neutral explanations. *See Dixon v. State,* 828 S.W.2d 42, 45–46 (Tex.Crim.App.1991)("tardiness" of juror arriving fifteen minutes late was acceptable race-neutral explanation for striking juror); *cf. United States v. Cooper,* 19 F.3d 1154, 1160 (7th Cir.1994) (government used peremptory challenge on African–American juror because it believed he would be unreliable and inattentive, based in part on the fact "that [he] had arrived 40 minutes late for one court session without explanation or apology").

¶ 168 Concerning the third step, the trial court did not clearly err in concluding that, based on the prosecutor's explanations, defendant's *Batson* challenge should be denied. The trial court gave defendant an opportunity to present a prima facie case (which he did); allowed the prosecutor an opportunity to respond with facially race-neutral explanations (which she did); gave defendant the opportunity to reply, pursuant to his burden to prove that the prosecution engaged in purposeful racial discrimination; and then made an ultimate determination as to the credibility of the prosecutor's given explanations. By following this pattern, the trial court fulfilled the requirements of the law, although it did not rule explicitly on whether the prosecutor's explanations were believable. *See People v. O'Shaughnessy,* 275 P.3d 687, 691 (Colo.App.2010), *aff'd,* 2012 CO 9, 269 P.3d 1233; *People v. Robinson,* 187 P.3d 1166, 1174 (Colo.App.2008) (noting trial court "obviously (albeit implicitly) found the prosecutor's stated reasons credible"); *cf. LaVallee v. Delle Rose,* 410 U.S. 690, 692, 93 S.Ct. 1203, 35 L.Ed.2d 637 (1973) (per curiam) ("Although it is true that the state trial court did not specifically articulate its credibility findings, it can scarcely be doubted ... that [the defendant]'s factual contentions were resolved against him.").

¶ 169 Nevertheless, defendant contends that we should engage in a comparative juror analysis by looking at "similarly situated" jurors, despite the fact that his trial counsel did not ask the trial court to do so. In our view, however, where a defendant raises such a contention for the first time on appeal, a cold appellate record is a poor substitute for the credibility determinations that the trial court uniquely is able to make. *See Snyder,* 552 U.S. at 483, 128 S.Ct. 1203 ("We recognize that a retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial. In that situation, an appellate court must be mindful that an exploration of the alleged similarities at the time of trial might have shown that the jurors in question

were not really comparable."). Thus, we decline to do so.

## VI. Imposition of Consecutive Sentences

¶170 Finally, we consider whether the trial court erred in imposing consecutive sentences for first degree murder and child abuse resulting in death. We conclude it did.

¶171 We review de novo a trial court's application of mandatory sentencing laws. *People v. Torres*, 224 P.3d 268, 277 (Colo.App.2009).

¶172 The People concede that when the evidence will support no reasonable inference other than that multiple convictions were based on identical evidence, the trial court is required to impose concurrent sentences for those convictions. *Juhl v. People*, 172 P.3d 896, 900 (Colo.2007); *see* § 18–1–408(3), C.R.S.2012.

¶173 Because the evidence presented at trial supports no reasonable inference other than that defendant's convictions of first degree murder and of child abuse resulting in death were based on identical evidence—that defendant starved his stepson, C.G., to death in a linen closet in his apartment—we conclude the trial court erred in imposing consecutive sentences for these convictions. *See Juhl*, 172 P.3d at 900. Hence, we reverse the sentence in part and remand the case to the trial court to correct the mittimus to reflect concurrent sentences on defendant's convictions of first degree murder and of child abuse resulting in death.

## VII. Conclusion

¶174 The judgment is affirmed, the sentence is reversed as to the consecutive sentences, and the case is remanded to the trial court to correct the mittimus to reflect concurrent sentences on defendant's convictions of first degree murder and of child abuse resulting in death.

Judge WEBB and Judge RUSSEL concur.