22CA1782 Peo v Dolan 01-08-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA1782
El Paso County District Court No. 21CR2005
Honorable Robin Chittum, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Richard Joseph Dolan,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE TOW
Lum and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced January 8, 2026

Philip J. Weiser, Attorney General, Grant R. Fevurly, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Kamela Maktabi, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Richard Joseph Dolan, appeals the judgment of conviction entered on a jury verdict finding him guilty of first degree murder.  We affirm.

## I.     Background

¶ 2     The jury heard evidence that would support the following findings.

¶ 3     Tara Moorhead called 911 to get medical assistance after the shooting of David Dawson inside her apartment.  Police arrived at the apartment at the end of the 911 call and found Dawson dead. According to Officer Phillip Richardson, Moorhead told him the shooter was "Woody," and their conversation was captured on his body camera, which was played to the jury.

¶ 4     Officers obtained surveillance footage from several cameras around the apartment complex, as well as a nearby church, and an officer began reviewing it while the suspect was still at large.  The footage showed the suspect, who was wearing a yellow construction vest and hard hat, come out of a different apartment, walk across the street and into Moorhead's apartment, stay in that apartment for some time, then walk out of her apartment and back across the street.  The suspect, who was no longer wearing the construction

attire, was then shown jumping a fence ten minutes after the shooting took place, entering a third apartment, and finally returning to the apartment from which he had started. He remained in that apartment until police arrested him and later identified him as Dolan. The jury was shown the surveillance footage as well as various screenshots of the footage.

¶ 5      Text messages between Dolan and Moorhead, and between Dolan and two other individuals, respectively, were also admitted into evidence. The text messages with Moorhead implied that they had some type of sexual relationship and that Dolan thought Moorhead was ending it. His last message to her said, "[T]his should be interesting." Dolan also texted the two other individuals that he needed to get out of the neighborhood.

¶ 6      Moorhead died, in an unrelated manner to the case, before trial.

¶ 7      Dolan was convicted of first degree murder and sentenced to life in prison without the possibility of parole.

## II.    Hearsay

¶ 8      Dolan contends that the trial court erred by admitting out-of-court statements identifying him as the perpetrator. He

2

contends that the statements are testimonial hearsay, and their admission violated his rights under the Confrontation Clause. We conclude that the statements were nontestimonial, and the court did not abuse its discretion by admitting the statements as excited utterances.

## A.   Additional Background

¶ 9      The prosecution filed a pretrial motion seeking to resolve issues surrounding the admissibility of Moorhead's 911 call — in which she identified Dolan as the perpetrator and described his appearance — as well as a body camera video — which showed Moorhead's statements when officers arrived at the crime scene, including that "Woody" was the shooter, his physical description, and where he lived.

¶ 10     The trial court allowed the admission of the 911 call and the part of the body camera video during which Moorhead made statements to Officer Richardson in the living room of the apartment, finding that these statements were nontestimonial and admissible as excited utterances under CRE 803(2).

¶ 11     At trial, both videos were played for the jury.

## B. No Confrontation Clause Violation

¶ 12 We review de novo whether a trial court violated a defendant's rights under the Confrontation Clause. *Nicholls v. People*, 2017 CO 71, ¶ 17. The Confrontation Clauses of the United States and Colorado Constitutions protect a defendant's right to confront the witnesses against them. U.S. Const. amend. VI; Colo. Const. art. II, § 16. These clauses bar the admission of testimonial hearsay unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 51-54 (2004); *Nicholls*, ¶¶ 22, 30.

¶ 13 The parties do not dispute that Moorhead was unavailable, that her statements were offered for the truth of the matter asserted, and that Dolan did not have a prior opportunity to cross-examine her. Thus, we must determine whether her statements were testimonial hearsay such that they should not have been admitted at trial. *See Davis v. Washington*, 547 U.S. 813, 821 (2006) ("It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.").

4

### 1. Moorhead's Statements Were Not Testimonial

¶ 14    Statements are "testimonial when . . . the primary purpose of the [investigation] is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 822. "[T]he relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." *Michigan v. Bryant*, 562 U.S. 344, 360 (2011); *see also People v. Phillips*, 2012 COA 176, ¶ 70 ("The primary purpose of an [investigation] is determined by objectively evaluating two main elements: (1) the circumstances in which the encounter occurred and (2) the statements and actions of both the declarant and [interviewer].").

¶ 15    In determining the primary purpose of the investigation, *Bryant* instructs us to objectively evaluate factors including (1) where the encounter occurred; (2) whether the statements were made during or after an ongoing emergency; (3) the level of formality of the encounter; (4) the nature of what was asked and answered; and (5) the purpose that reasonable participants would have had.

562 U.S. at 359-60, 366; *Phillips*, ¶ 70.  Although it is not dispositive, whether there is an ongoing emergency is an important factor.  *Bryant*, 562 U.S. at 366.

¶ 16    "[W]hether an emergency exists and is ongoing is a highly context-dependent inquiry" and asks not only whether the threat to the victim has been neutralized, but whether a threat to the police and public continues.  *Bryant*, 562 U.S. at 363.  The duration and scope of an emergency may depend on the type of weapon involved; the severity of the victim's injuries, to the extent that sheds light on the purpose of the victim in responding to police questions or the magnitude of continuing threat; whether the perpetrator has been disarmed, apprehended, or "flees with little prospect of posing a threat to the public"; whether the threat is a public threat or a private dispute; and the formality or informality of the encounter between the declarant and police.  *Id.* at 364-66.

¶ 17    Our review of the record confirms that Moorhead's statements to the 911 dispatch operator and to Officer Richardson were not testimonial under this rubric.

¶ 18    Moorhead called 911 immediately after Dawson was shot.  Her focus on the call was to get Dawson immediate medical help.  She

was emotional and crying during the call and said that the shooting had just happened. The 911 dispatch operator asked questions to determine the appropriate response to the situation; the call lasted approximately five minutes and ended once police arrived on scene. Moorhead did not answer all the 911 dispatch operator's questions because of how distraught she was and given her focus on getting Dawson immediate help. Therefore, viewing the circumstances objectively, Moorhead's statements were made "for the purpose of enabling police to address an ongoing emergency" and, thus, were nontestimonial. *People v. McFee*, 2016 COA 97, ¶ 39; *see also Davis*, 547 U.S. at 827-28 (a statement during a 911 call identifying the defendant as the caller's assailant was not testimonial because the caller was speaking during and in the immediate aftermath of the events; the caller was facing an ongoing emergency; the statements were necessary to resolve the present emergency rather than just to learn what had happened in the past; and the interview was informal, with the caller's answers "frantic" and "in an environment that was not tranquil").

¶ 19 Officers arrived on scene at the end of the 911 call. Moorhead then made statements to Officer Richardson in an informal setting

shortly after the shooting and before medical personnel arrived. Moorhead remained emotional throughout her interaction with Officer Richardson and continued to have trouble answering questions because of her heightened emotional state. She exclaimed "Please hurry" when another officer arrived and later asked, "Where's the ambulance?" Though Moorhead answered most of the questions in the past tense and did not say she needed help or medical assistance, she was seeking medical help for Dawson.

¶ 20    Officers did not have control of the situation when Officer Richardson was asking Moorhead questions. Officer Richardson did not know whether the shooter continued to pose a threat to other members of the public or police but knew that a shooting had occurred in a residential area and that the shooter was at large.

¶ 21    Officer Richardson needed to ascertain identifying information about the shooter to allow officers to locate him. To that end, he asked Moorhead questions like, "Who did this?" and "What'd they look like?" and "Tell me what you saw." After Moorhead responded that it was "Woody," Officer Richardson asked what he looked like, what he was wearing, and about his height, age, address, last

name, and phone number — all questions aimed at finding the shooter, not at developing the case against him. During the questioning, Officer Richardson attempted to calm Moorhead down, told her to focus, and asked short questions to get the identifying information as quickly as possible. At one point, he interrupted his interview to radio that he needed "that dog" and instructed newly arriving officers to get Dawson immediate assistance. Once Officer Richardson was done getting the identifying information from Moorhead, he immediately communicated it to other officers so that they could help locate the shooter. He did not ask her any further questions.

¶ 22 Viewing the circumstances objectively, we conclude that the "primary purpose of the [officer's investigation was] to enable police assistance to meet an ongoing emergency" and that Moorhead's statements were nontestimonial. *Davis*, 547 U.S. at 822.

¶ 23 Because Moorhead's statements were nontestimonial, Dolan's confrontation rights were not implicated, and we need only address whether the admission of her statements satisfies our state rules of evidence.

## 2. The Statements Were Excited Utterances

¶ 24    Admission of nontestimonial hearsay is governed by traditional evidentiary rules regarding hearsay. *People v. Mullins*, 104 P.3d 299, 303 (Colo. App. 2004). The trial court determined that Moorhead's statements fell within the excited utterance exception to the hearsay rule. We review that determination for an abuse of discretion. *People v. King*, 121 P.3d 234, 238 (Colo. App. 2005). A trial court abuses its discretion if its ruling misconstrues or misapplies the law or is manifestly arbitrary, unreasonable, or unfair. *People v. Gee*, 2015 COA 151, ¶ 23.

¶ 25    An excited utterance is a statement relating to a startling event made while the declarant was under the stress of the excitement caused by the event. CRE 803(2). A statement may be admissible as an excited utterance if (1) the occurrence or event was sufficiently startling to render inoperative the normal reflective thought processes of an observer; (2) the declarant's statement was a spontaneous reaction to the event; and (3) direct or circumstantial evidence supports an inference that the declarant had the opportunity to observe the startling event. *People v. Abdulla*, 2020 COA 109M, ¶ 64. The parties do not dispute that the event was

10

startling or that Moorhead had the opportunity to observe it. Rather, they dispute whether her statements were spontaneous reactions to the event.

¶ 26 Moorhead's statements occurred minutes after watching Dawson get shot and as he was dying (or dead). As discussed, she was emotional both on the 911 call and when speaking to Officer Richardson and had difficulty answering questions. Nor does the fact that some of the statements were made in response to questions preclude them from being excited utterances. *People v. Garrison,* 109 P.3d 1009, 1012 (Colo. App. 2004). Thus, we agree with the trial court that Moorhead was still under the stress of the event both during the 911 call and when speaking to Officer Richardson, and her statements were a spontaneous reaction to the shooting. The trial court therefore did not err by admitting the 911 call or a portion of the body camera video.

## III.  Jury Instruction

¶ 27 Dolan contends that the credibility instruction given by the trial court applied only to testifying witnesses and nothing in the instruction suggested that the jury should apply it to a nontestifying witness's out-of-court statements. He thus contends

11

that none of the given instructions informed the jury that it should assess and weigh Moorhead's credibility.  We discern no error.

¶ 28    Defense counsel proposed the following instruction:

> Evidence is what the witnesses say under oath, and items allowed as exhibits.
>
> If information came from a person who did not testify, you must consider the inability of the defense to confront their story, the potential of their credibility being undermined if they had testified, and any information learned about them, negative or positive, that would speak to the accuracy or motivations of their testimony.
>
> Witnesses who testify can have their credibility directly assessed by the jury according to INSTRUCTION NO. ___.  You may believe all of the testimony of a witness, part of it, or none of it.
>
> The jury may also consider INSTRUCTION NO. ___ as it applies to a statements made by a person the defense has been denied the opportunity to cross-examine.  You may believe all of their story, part of it, or none of it.

¶ 29    The trial court denied giving the tendered instruction, stating,

> I don't think that the proposed instruction isn't a statement of the law.  I think it is appropriate.  I'm just not going to give it because I think it gives undue weight to the evidence from Ms. Moorhead.  It is obtained in the current instructions.  And certainly it's appropriate for defense counsel to argue much of what is in the proposed instruction, but I'm not going to give it.

12

Instead, it gave the general credibility instruction. *See* COLJI-Crim. E:05 (2024).

¶ 30    We review de novo whether the jury instructions as a whole accurately informed the jury of the governing law. *People v. Manyik*, 2016 COA 42, ¶ 65. However, we review the trial court's decision regarding whether to give a particular jury instruction for an abuse of discretion. *Id.*

¶ 31    Dolan contends that his instruction, which merely "apprised jurors of factors it could consider when assessing and weighing the credibility of witnesses who did not testify in court," was not encompassed in the jury instructions that were provided. We disagree.

¶ 32    The proposed instruction went beyond just stating that the jury was to determine the weight and credibility to give any out-of-court statements.[1] It defined evidence — taking the definition from a model criminal jury instruction that is designed to be given prior to opening statements, *see* COLJI-Crim. B:03

---

[1] We note that there is no model criminal jury instruction regarding assessing the credibility of out-of-court statements, except for child declarants. *See* COLJI-Crim. D:12 (2024).

(2024) — even though the instructions already defined direct and circumstantial evidence. The tendered instruction also twice repeated part of the general credibility instruction. *See People v. Nunez,* 841 P.2d 261, 265 (Colo. 1992) ("We have also held that it is not error for a judge to refuse a tendered jury instruction when that instruction is 'encompassed' or 'embodied' in the other instructions." (collecting cases)).

¶ 33    More problematic, it essentially told the jury that it must be more skeptical of a hearsay declarant's testimony *because* the declarant was not subject to cross-examination. And it strongly suggested the existence of information that would have undermined Moorhead's credibility had such cross-examination occurred. These are not correct statements of the law, and Dolan cites no authority, nor are we aware of any, suggesting otherwise. *See People v. Lee,* 30 P.3d 686, 689 (Colo. App. 2000) ("[T]he trial court need not give the defendant's tendered instruction if it is argumentative, contains errors of law, merely reiterates portions of the evidence, or is encompassed within the other instructions."). Thus, we are not persuaded that the trial court abused its discretion by not giving Dolan's tendered instruction. *See Manyik,* ¶ 69 ("We may affirm the

court's ruling on any ground supported by the record, even if that ground was not articulated or considered by the court.").

¶ 34     We further note that, while the model credibility instruction does not explicitly apply to hearsay declarants, we think it highly unlikely on this record that the jury would have thought that it did not. Indeed, during closing argument, defense counsel told the jury to apply it when arguing that Moorhead was not credible and referencing the general credibility instruction. Defense counsel also pointed out that the jury did not have the opportunity to see Moorhead on the stand and that they could consider that fact when deciding whether or not they believed her story. Finally, defense counsel said, "Just like for any other witness, for any other story, you can disregard all of it. That is your decision." In short, defense counsel argued the substance of the proposed instruction to the jury. *Cf. Lee*, 30 P.3d at 689 (finding that there was no error in the trial court's revised theory of the case instruction because the defendant thoroughly presented his theory in closing).

## IV. Video Footage Narration

¶ 35    Dolan next contends that the trial court erred by admitting officers' testimony identifying him in surveillance videos. We discern no error.

### A. Additional Background

¶ 36    Videos from the apartment complex's surveillance system and a nearby church were admitted at trial, showing the suspect's movements the day of the incident, including from Moorhead's apartment, around the complex, and eventually to the apartment where Dolan was arrested.

¶ 37    Specifically, Officer Kevin Retzlaff testified seeing a "man dressed in black pants and like a construction vest, come out of the apartment where the incident took place," as well as the movements of the man before and after the shooting. Videos were not played during his testimony, nor did Officer Retzlaff identify the man in the videos as Dolan.

¶ 38    During Detective Matthew Kerr's testimony, the prosecution played two of the surveillance videos. The first video was a compilation of the surveillance footage videos. While playing this video for the jury, the prosecutor asked various questions about the

footage.  Detective Kerr answered those questions and pointed out areas of interest on the video, such as the locations of where the hard hat and construction vest were later found by police, as well as movements the suspect made that were difficult to see; placed the video into the timeline of the incident; and made other observations (such as, "the apparent suspect running from behind the shed, obviously not wearing the same clothing, but has kind of the same pretty distinct gait as he runs").  Detective Kerr referred to the individual on the video as the "suspect" and did not identify Dolan by name.

¶ 39    The second video showed Dolan's arrest.  While this video was played, Detective Kerr identified Dolan as the person who was depicted on the video as being arrested.

¶ 40    During Detective Nicole Black's testimony, the prosecution played three videos and, while doing so, Detective Black answered questions about the timing of the videos, directed the jury's attention to certain areas of the screen to watch, and described what the individual or suspect was doing (for example, "So the individual jumps over the fence from that corner here wearing the

17

construction vest and construction helmet"). Detective Black also did not identify Dolan by name.

### B. Standard of Review and Applicable Law

¶ 41 Under CRE 701, a lay witness may testify to opinions or inferences so long as they are (a) rationally based on the perception of the witness; (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of CRE 702.

¶ 42 Lay opinion testimony is permitted under Rule 701 because "it has the effect of describing something that the jurors could not otherwise experience for themselves by drawing upon the witness's sensory and experiential observations that were made as a firsthand witness to a particular event." *McFee*, ¶ 76 (quoting *United States v. Freeman*, 730 F.3d 590, 595 (6th Cir. 2013)). But a lay witness's opinion based on exactly the same information that the jury has cannot be helpful to the jury. *Id.*

¶ 43 Specifically, a lay witness may testify regarding the identity of a person depicted in a surveillance photograph or video if there is some basis for concluding that the witness is more likely to

correctly identify the defendant from the photograph or video than the jury. *See Robinson v. People*, 927 P.2d 381, 382 (Colo. 1996).

¶ 44    "[We] must not disturb a trial court's admission of evidence pursuant to CRE 701 absent an abuse of discretion." *Id.* at 384.

### C.    Application

¶ 45    As an initial matter, for two of the videos, Dolan points us to nowhere in the record where officers identified the person on the videos as Dolan. Only in Detective Kerr's narration of the video showing Dolan's arrest did any witness identify Dolan as the person in the video. Thus, it is not clear that *Robinson* would even apply to any testimony other than Detective Kerr's.

¶ 46    In any event, we discern no error in permitting the officers' narrations.

¶ 47    The officers spent hours watching the surveillance videos and had additional knowledge that the jury did not have that contributed to their ability to explain each of the videos. Detective Kerr testified that his review "probably took a week total time." Detective Black created screenshots based on her review of the videos, which pointed out specific details, implying she also spent a considerable amount of time reviewing the videos. *See People v.*

*Grant*, 2021 COA 53, ¶ 66 (noting that the detective watched the surveillance video "several dozen times," which was not true of the jury). Officer Retzlaff testified he was familiar with the camera systems at the apartment complex because it was his "normal [patrol] area." Further, both detectives went to the apartment complex during the investigation and participated in searches of the area depicted in the videos, which included recovering clothing and other items shown in the videos.

¶ 48 Thus, the jury was not in the same position as the testifying officers and there was some basis for the trial court to find that they were in a better position than the jury. *See id.* Further, the officers' explanations were helpful to the jury, even if the jurors could have viewed the videos themselves, given the officers' knowledge of the scene and the varied camera angles showing the suspect's movements in different locations around the apartment complex. *See id.*

¶ 49 Nor are we persuaded otherwise by Dolan's assertion that interpretation of the videos amounted to an opinion that Dolan was guilty and committed the offense, thereby invading the province of the jury. Although Detective Kerr identified Dolan as the person in

the surveillance video getting arrested, he did not take the additional step of opining that Dolan committed the charged offenses. *See People v. Penn*, 2016 CO 32, ¶ 31; *Gallegos v. People*, 403 P.2d 864, 873 (Colo. 1965) ("[T]o say [the witness] identified the defendants does not give rise to the conclusion that they were, therefore, guilty of the crime charged."). And, as noted, the other two officers never identified Dolan as the man in the videos.

¶ 50 Accordingly, the trial court did not err by allowing this testimony.

## V. Video Screenshots

¶ 51 Dolan also contends that the trial court erred by admitting screenshots taken from the surveillance videos because it violated CRE 403 under the reasoning in *People v. Tardif*, 2017 COA 136. We discern no error.

¶ 52 At trial, both detectives testified about screenshots taken from the surveillance videos, which were admitted into evidence. Many of the screenshots included either text boxes explaining what was shown or a small red circle around a particularly small detail, or both.

¶ 53     Under Rule 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." That being said, the rule "strongly favors admissibility of relevant evidence," *People v. Gibbens*, 905 P.2d 604, 607 (Colo. 1995), and "the balance should generally be struck in favor of admission when evidence indicates a close relationship to the event charged." (quoting *People v. Dist. Ct.*, 785 P.2d 141, 146 (Colo. 1990)).  Unfair prejudice in this context "does not mean prejudice that results from the legitimate probative force of the evidence." *Id.* at 608.  Rather, it means an undue tendency to suggest a decision on an improper basis, such as bias, sympathy, anger, or shock.  *Id.* We review a trial court's decision to admit evidence under Rule 403 for an abuse of discretion.  *See Yusem v. People*, 210 P.3d 458, 463 (Colo. 2009).

¶ 54     In *Tardif*, the division concluded that two slow-motion recordings of a shooting were relevant, but their probative value was "very low" because "[t]he real-time recording was admitted and clearly showed the sequence of events around the shooting." *Tardif*, ¶¶ 47-48.  The division also concluded that "by altering the real-time recordings of the shooting, the slow-motion recordings

22

may have portrayed Tardif's actions as more premeditated than they actually were." *Id.* at ¶ 49.

¶ 55     But *Tardif* does not stand for the proposition that the prosecution may never show video stills. Moreover, the facts in *Tardif* are distinguishable from the facts before us.

¶ 56     Dolan contends that the screenshots misled the jurors by making it seem as if his act was more purposeful than he claimed. But the jurors could not have been misled into thinking the screenshots (as opposed to slow-motion videos) were the speed at which the events took place, nor did the prosecutor present them as a frame-by-frame depiction of what happened.

¶ 57     The prosecution showed the screenshots to isolate specific facts that were otherwise difficult to see on the real-time videos. For example, the prosecution showed a screenshot of the suspect throwing the hard hat he had been wearing to the right in a parking lot.[2] For this reason, we do not find persuasive Dolan's contention that this evidence was needlessly cumulative.

---

[2] Dolan does not explain how the notations on the exhibits exacerbated any danger of unfair prejudice, and thus, we do not consider that argument. *See People v. Cuellar*, 2023 COA 20, ¶ 49.

¶ 58     Assuming the maximum probative value that a reasonable fact finder might give the evidence and the minimum unfair prejudice to be reasonably expected, we cannot say that the trial court abused its discretion by admitting the screenshots.

## VI.   Text Messages

¶ 59     Dolan contends that the trial court erred by admitting text messages between Dolan and Moorhead, Dolan and "Curser," and Dolan and "Connie Ma" because the messages he purportedly sent were not authenticated and were hearsay.[3]  The People contend that Dolan waived his authentication argument with respect to his text messages with Moorhead.  We also have "an independent, affirmative duty to determine whether a claim is preserved and what standard of review should apply, regardless of the positions taken by the parties."  *Forgette v. People*, 2023 CO 4, ¶ 15 (quoting *People v. Tallent*, 2021 CO 68, ¶ 11).  In fulfilling that duty, we conclude that Dolan waived his argument with respect to the authenticity of all the text messages attributed to him.

---

[3] Dolan does not challenge the authentication of the text messages sent by Moorhead, Curser, or Connie Ma.

¶ 60    Waiver is "the intentional relinquishment of a known right or privilege." *People v. Rediger*, 2018 CO 32, ¶ 39 (citation omitted). We review de novo whether a waiver occurred. *Forgette*, ¶ 12.

¶ 61    The prosecution sought to introduce text messages between Dolan and Curser and Dolan and Connie Ma. Defense counsel objected and drew a distinction between these text messages and those with Moorhead stating,

> I would like to make, I think, my explanation very clear. The difference that I see between these text messages and the text messages of Tara Moorhead is the Court has already ruled that my confrontation objection of Tara Moorhead was unsuccessful, has already denied these. And I think that this text message thread is necessary to correct what I will call misleading information that the jury could have received regarding Ms. Moorhead and her relationship with my client. And so that is why I'm not . . . . It's a tactical decision in light of the Court's [ruling on a different motion].

The trial court admitted the messages, subject to the prosecutor laying the appropriate foundation.

¶ 62    Later, the court admitted the text messages between Dolan and Moorhead with no objection from defense counsel. Thereafter, defense counsel introduced three exhibits, representing that they

25

were text messages between Dolan and Moorhead, which Detective Black confirmed. The phone numbers involved in the text messages that defense counsel admitted matched those of the text messages the prosecutor introduced. Defense counsel also conceded in closing argument that Dolan was the one who sent these text messages to Moorhead.

¶ 63 We acknowledge that counsel described the decision not to object to the text messages between Dolan and Moorhead as being the result of the court's denial of his Confrontation Clause challenge involving the admission of Moorhead's statements. Nevertheless, we conclude that this self-described "tactical decision" was an intentional relinquishment of a known right. Defense counsel admitted additional text messages between Dolan and Moorhead and elicited testimony from Detective Black identifying Dolan and Moorhead as being the participants in this chain of messages. Thus, Dolan cannot now complain on appeal that the other messages he sent, from the same phone number, were not authenticated. *See Rediger*, ¶ 39.

¶ 64 Turning to the text messages between Dolan and Curser, defense counsel asked Detective Black on cross-examination if the

message were between Dolan and Curser, and Detective Black answered that they were. And defense counsel asked Detective Black if a different set of text messages were between Dolan and Connie Ma.[4] Because defense counsel again introduced evidence that the messages were between Dolan and Curser and between Dolan and Connie Ma, he cannot now complain on appeal that Dolan's messages in these exchanges were not authenticated as his. *See id.*

¶ 65 As to Dolan's contention that the statements he texted were hearsay, we discern no error. Dolan's statements were statements by a party-opponent and were therefore admissible. *See* CRE 801(d)(2)(A).[5]

## VII. Impeachment Evidence

¶ 66 Dolan contends that the trial court reversibly erred by excluding evidence that was relevant to impeaching Moorhead's credibility by showing that she was not truthful when she said that

---

[4] Counsel actually referred to the other person in this text exchange as Consuelo Bensor. Other evidence in the record established that Bensor was also known as Connie Ma.

[5] Again, Dolan does not direct this appellate argument to Moorhead's, Curser's, or Connie Ma's texts in these exchanges.

there was only one altercation on the night before the incident. Dolan further contends this exclusion improperly limited his right to present a complete defense and confront the prosecution's evidence. Even assuming, without deciding, that it was error to exclude such evidence, we discern no reversible error.

¶ 67 During the cross-examination of Detective Black, defense counsel inquired about statements Moorhead made to officers about an altercation the night before the shooting. This line of questioning revealed that Moorhead had initially told officers that there had not been an argument that night but then later told officers that there had been an altercation between Dawson and Timothy Mulhauser. Defense counsel then asked if Moorhead had indicated whether Dawson had fought with anyone else during that timeframe, and Detective Black responded, "I believe she said — I know when I spoke to people . . . it's been learned that there was some other altercation between David Dawson and some other individuals, yes."

¶ 68 Defense counsel then started to introduce evidence that officers had interviewed another individual who said that there was

a second altercation that night, but the court did not allow this testimony.

¶ 69　The parties disagree on which standard of review applies to Dolan's arguments.  Dolan contends that the constitutional harmless error standard applies because the trial court "deprived [him] of any meaningful opportunity to present a complete defense." *People v. Osorio-Bahena,* 2013 COA 55, ¶ 17 (quoting *Krutsinger v. People,* 219 P.3d 1054, 1061 (Colo. 2009)).  In contrast, the People assert that the nonconstitutional harmless error standard applies because the court's evidentiary ruling did not foreclose Dolan's opportunity to test the prosecution's evidence.  *See People v. Conyac,* 2014 COA 8M, ¶ 93 ("An erroneous evidentiary ruling may rise to the level of constitutional error if it deprived the defendant of any meaningful opportunity to present a complete defense.").

¶ 70　We need not determine which standard of review applies, however, because even applying a constitutional harmless error standard of reversal, we discern no reversible error.  Under that standard, reversal is required unless the error was harmless beyond a reasonable doubt.  *Hagos v. People,* 2012 CO 63, ¶ 11.

¶ 71 Most importantly, despite the court excluding this evidence, the jury still heard testimony from Detective Black that officers had learned there was an additional altercation that night that Moorhead had not disclosed. The jurors also heard multiple times that Moorhead had not initially told officers about the altercation between Dawson and Mulhauser. And defense counsel was still able to argue in closing argument that Moorhead was not credible for multiple reasons, including that she did not initially tell officers about Dawson and Mulhauser's altercation. Thus, any error was harmless beyond a reasonable doubt. *See People v. Houser*, 2013 COA 11, ¶¶ 70-71; *Vega v. People*, 893 P.2d 107, 120 (Colo. 1995).[6]

## VIII. Disposition

¶ 72 The judgment is affirmed.

JUDGE LUM and JUDGE MOULTRIE concur.

---

[6] Because we have only assumed one error by the trial court, we conclude that there is no cumulative error. *See Howard-Walker v. People*, 2019 CO 69, ¶ 25 (cumulative error requires multiple errors).